155 N.J. Super. 186 (1977)
382 A.2d 654
IN THE MATTER OF THE GUARDIANSHIP OF R.G. AND F., MINORS.
Superior Court of New Jersey, Appellate Division.
Argued November 22, 1977.
Decided December 15, 1977.
*188 Before Judges HALPERN, LARNER and KING.
*189 Mr. Heikki Leesment, Deputy Attorney General, argued the cause for appellant New Jersey Division of Youth and Family Services (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
Mr. Leo N. Knoblauch, argued the cause for respondent, Mr. P.
Mr. Barry Sarkisian, argued the cause for respondent, Mrs. P.
The opinion of the court was delivered by KING, J.A.D.
This matter is here on appeal by the New Jersey Division of Youth and Family Services (Division) following the trial court's grant of defendants' motions to dismiss the Division's petition for termination of parental rights at the conclusion of the Division's case. In December 1975 the Division filed a complaint for termination of parental rights and commitment of the three children of Mr. and Mrs. P to the guardianship and control of the Division. The question before us is whether the proofs presented by the Division before the Juvenile and Domestic Relations Court were sufficient to establish a prima facie case and withstand a motion to dismiss. We conclude the proofs were sufficient to withstand a motion to dismiss and reverse and remand for a new trial.
This guardianship petition concerns three children: R, age nine; G, age six; and F, age five. The Division was first involved with this family in July 1971 when the parents requested foster care placement for a brief period. In August 1973 the parents again requested foster care placement. This request was not undertaken. However, a month later the children were placed in foster care, allegedly because of Mr. P's nervous condition and the parents' financial situation. The day following placement the parents demanded G's return, which the Division refused. In October 1973 the parents *190 again requested return of the children. Professional counselling was proffered and was rejected by the parents, who relented in their requests for the children at this time. In November the parents again requested G's return. Again, the parents refused therapy.
In December G was returned to his parents. In February 1974 the parents again rejected therapy. Finally, in March the parents agreed to a counseling program and R and F were returned to them. In April Mr. P once more requested the children be placed in foster care because of the stresses operating within the family. The children were removed by the Division, and the parents simultaneously signed a contract allowing them to remain in foster care for a year. The following day Mr. P called the Division and wanted the children back.
In June 1974 the parents came to the Division to meet the caseworker and supervisor. They wanted G and R returned, but not F, who was the "root" of their problem, they said. Recommendations were made for medical evaluation and day care placement. In August G and R were returned. On October 23, 1974 Mr. P once more requested placement but the children were not removed by the Division at that time. This request was repeated on November 12, 1974. The following day, G was brought to the Division office. His fingers were taped because he had bitten them almost to the bone. He was then placed in foster care on November 18. Thereafter, R was placed.
Another conference with Division personnel was held in January 1975. The parents were told that recent medical evaluation disclosed that G was emotionally upset because of lack of stability. The parents agreed to temporary foster care. They did not desire visitation at this time. Mr. P continued his pattern of refusing therapy for his mental illness.
In April 1975 the parents again requested the return of G and R, but not F. The assistant supervisor refused to return the children. She advised the parents to seek legal assistance as a custody suit would be necessary. The complaint *191 was filed in December 1975. The children were placed under the care of the Division pending a final hearing. In February 1976 the trial judge entered an interim order for mental evaluations. In May 1976 a consent order was signed by the trial judge requiring the parents to undergo a detailed course of in-patient (Mr. P) and out-patient treatment (Mrs. P) at the Jersey City Medical Center. The order contemplated a course of therapy directed towards ultimately reuniting the family on a healthy basis. The order provided that upon a breach of the agreement by either parent the matter would be promptly scheduled for final hearing. The parents did not complete the course of treatment agreed upon. The case was tried on several continued dates between July 8 and October 22, 1976. At the conclusion of the Division's case, counsel for the parents moved to dismiss the complaint. In an opinion dated November 24, 1976 the complaint was dismissed. The children have remained in the care of the Division pursuant to this court's order pending resolution of the appeal.
The Division offered two expert witnesses at the hearing, in addition to the evidence presented by its professional staff. Dr. Goldfarb, a board certified neuropsychiatrist, had examined the parents and devised the treatment plan described in the May 6, 1976 order. Mr. P left the hospital and would not cooperate with the plan. Dr. Goldfarb diagnosed Mr. P as a severe case of paranoid schizophrenia. He said Mr. P was poorly motivated to accept treatment, a conclusion completely harmonious with P's conduct since his disease was first diagnosed in 1962. Treatment was a necessity if any improvement were to be obtained.
Mrs. P was diagnosed as a passive-dependent inadequate personality. She left her treatment program in May 1976 on her husband's insistence. Absent proper therapy, Dr. Goldfarb believed Mrs. P would tend to follow her husband's needs, not the children's.
Matthew Hagovsky, a clinical psychologist evaluated the entire family constellation. He felt Mrs. P's illness would adversely affect the children. He felt strongly that if the *192 treatment plan was violated, there were grounds to remove the children from the parents. To permit the children to remain with the parents without the implementation of a reasonable treatment plan would be "unfair" and "psychologically unhealthy" for the children, according to Hagovsky. He felt the children simply could not be stretched any further. Since the treatment plan was not followed by Mr. and Mrs. P, the Division should have custody in Hagovsky's opinion. It was Hagovsky's conclusion that the union of the mental conditions present in Mr. and Mrs. P created a very difficult, if not impossible, environment in which to raise the children. The demands of the children were "simply overwhelming" the parents. Hagovsky's serial examination of the children disclosed emotional problems of significance. He noted improvement since their placement in foster care and he felt home conditions were against return of the children. The March 1976 reports of Dr. Fusella, Chief Clinical Psychologist, and Dr. Hoffman, Director of the Adult Psychiatric Outpatient Clinic, both of the Jersey City Medical Center, were presented to the court as part of the evaluation procedure. As to Mr. P, the team report concluded: "At the present time, Mr. [P] is dysfunctional in all areas and it appears that he possesses almost none of the qualities necessary for adequate parenting. Diagnosis: Paranoid Schizophrenia." As to Mrs. P, the team report concluded: "At the present time, Mrs. [P's] level of functioning is significantly impaired and it appears that she possesses little in the way of skill necessary for adequate mothering." These reports were properly before the court, In re Cope, 106 N.J. Super. 336, 343 (App. Div. 1969), and were "prima facie evidence of the validity of the conclusions contained in them." Id. at 344.
The Division is attempting to terminate the parental rights of Mr. and Mrs. P on alternative grounds under N.J.S.A. 30:4C-15(c) and (d)

*193 Whenever * * *
(c) it appears that the best interest of any child under the care or custody of the Bureau of Children's Services require that he be placed under guardianship; or (d) it appears that a parent or guardian of the child, following the acceptance of such child by the Bureau of Children's Services * * *, and notwithstanding the diligent effort of such agency to encourage and strengthen the parental relationship, has failed substantially and continuously or repeatedly for a period of more than 1 year to maintain contact with and plan for the future of the child, although physically and financially able to do so; a petition, setting forth the facts in the case, may be filed with the juvenile and domestic relations court of the county where such child may be at the time of the filing of such petition.
The Division has the burden of establishing these grounds for termination of parental rights by clear and convincing evidence. In re Gardianship of B.C.H., 108 N.J. Super. 531, 537 (App. Div. 1970); In re N., 96 N.J. Super. 415, 424 (App. Div. 1967). As stated in Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969), the judicial function on a motion for in-involuntary dismissal under R. 4:37-2(b) "is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Our review of the trial court's opinion leads us to conclude that he did not follow this mandate. He weighed the testimony and rejected the worth of the Division's proofs. This was improper in view of the nature of the proof presented by the Division and which we have outlined generally above. The motion should have been denied. The proofs presented by the Division demonstrated a course of events occurring over a five-year period to this unfortunate family which culminated in this petition to terminate. Adequate lay and expert testimony was presented to meet the Division's burden in this case. It is not our function to comment on the weight of the evidence. It is sufficient for the moment to hold that the proofs were adequate to withstand the motion.
*194 This case may be unusual in that no physical abuse or neglect is asserted. The Division contends that the parents' unfortunate mental illnesses react synergistically to create an environment in which they cannot adequately care for and raise the children. The appropriate standard for determining whether a Division petition should be granted pursuant to N.J.S.A. 30:4C-15(c) was established in In re Cope, supra, where this court stated:
It is, therefore, incumbent upon the Bureau, or other petitioner for guardianship, to show more than that it will provide a better home for the child. It must demonstrate affirmatively that the child's "best interests" will be substantially prejudiced if he is permitted to remain with his parent  e.g., that his health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change, or that the parent is in someway incapable of caring for the child or unwilling to do so. [106 N.J. Super. at 340-341]
There is no doubt that the mental health of the child and its best interest psychologically must always be considered. The absence of physical abuse or neglect is not conclusive on the issue of custody. The trial court must consider the potential for serious psychological damage to the child inferential from the proofs. Sorentino v. Family & Children's Society of Elizabeth, 72 N.J. 127, 131-132 (1976) and 74 N.J. 313 (1977). See also, Sees v. Baber, 74 N.J. 201 (1977) where the Supreme Court stated:
It has been recognized that the psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood. [at 222]
Here the children have been thoroughly examined and tested for psychological problems, a situation not possible with an infant as in Sees v. Baber, supra.
We note the trial court's concern with the absence of any moral culpability or fault on the part of the parents. The fact the parents may be morally blameless in this unfortunate *195 situation is not conclusive on the issue of permanent custody. Undoubtedly, their inadequacy as parents stems from their mental illness and the interaction of their personalities. But N.J.S.A. 30:4C-15(c) speaks to the "best interests of any child," not simply the presence or absence of culpable fault on the parents' part. The psychological capacity of the parents may have more bearing under N.J.S.A. 30:4C-15(d), but is only a factor in the determination whether they are truly motivated to keep the children. Nor can we ascribe merit to the suggestion in the briefs and oral arguments that Mrs. P's parental rights be considered on a separate basis than her husband's. The concern must be for the best interest of the children in the context of the environment to which they would be returned, their parents' home, and not the possessory rights of a single parent, who might be less afflicted than her spouse. Any consideration of Mrs. P's rights independent of the family unit would be unrealistic and impractical.
In view of our conclusion that the Division has presented a prima facie case under both N.J.S.A. 30:4C-15(c) and (d), we remand the matter for a new hearing. The case should be assigned to a new trial judge. The judge who heard the matter below has already engaged in weighing the evidence and has rendered a conclusion on the credibility of the Division's witnesses. This was an improper undertaking at this procedural juncture. The trial judge has "given his opinion upon a matter in question in the action", within the meaning of R. 1:12-1(d), and although this mistake was certainly inadvertent and with good intentions, he should be disqualified from hearing the matter as a factfinder on remand.
Because of the passage of time that has accompanied these proceedings, the proofs on remand should reflect the current status of the P family in all respects. The Division will have the opportunity to reopen its case and to obtain such additional examinations as it deems suitable, in order *196 to properly reflect contemporary conditions. We certainly think up-dated proofs as to the children's progress or lack of progress while continuing in foster care would be important to the trier of fact on remand. Mr. and Mrs. P have expressed, through counsel, a desire to present proofs in their case, including expert testimony and they should have every opportunity to do so. See In re Guardianship of B.C.H., supra, 108 N.J. Super. at 539.
We wish to commend counsel for Mr. and Mrs. P, who have served at trial and on appeal by court appointment, without compensation, for their excellent presentation. Their service without expectation of fees has reflected the highest tradition of the bar and we are appreciative.
On remand the trial judge may in his discretion utilize portions of the lengthy transcript from the prior hearing or require in-court testimony. The testimony as preserved may be used without the need for a total repetition of the original hearing. See R. 1:12-3. This matter must receive a maximum priority on remand. Upon receipt of the opinion all parties should arrange to meet with the judge to whom the case is assigned for the scheduling of any examinations and an imminent trial date.
Reversed and remanded. Jurisdiction is not retained.