210 N.J. Super. 512 (1985)
510 A.2d 117
IN THE MATTER OF THE GUARDIANSHIP OF J.P.M.
Superior Court of New Jersey, Chancery Division Family Part, Cape May County.
November 4, 1985.
*514 Gaby Gross, Dep. Atty. Gen., for plaintiff Division of Youth & Family Services.
Harold S. Vogel for defendant J.G.
Doreen Y. Corino, law guardian for J.P.M.
WILLIAMS, A.J.S.C.
This matter came before the court for trial on June 27 and July 11, 1985. At the conclusion of the trial, decision was reserved. Unfortunately, before the decision could be rendered the trial judge passed away. Thereafter, all counsel, with the consent of defendant, requested review of the trial transcripts and a decision based upon those transcripts.
This action has been brought by the Division of Youth & Family Services pursuant to N.J.S.A. 30:4C-15(c), seeking to terminate parental rights of J.G. with respect to the minor involved herein, J.P.M.J.P.M. was born September 28, 1979, in Middle Township, New Jersey, to N.M. On the birth certificate N.M. named D.M. as the child's father. Thereafter, pursuant to an order of May 13, 1980, J.G., defendant herein, was adjudicated as the father of the child. The present whereabouts of N.M. are unknown and she has been defaulted in this action. She has maintained no contact with the child since shortly after his birth. Defendant J.G. is presently incarcerated in the New Jersey State Prison System for sexual assault upon a seven-year-old child.
On December 3, 1982, J.G. signed a voluntary placement with the Division of Youth & Family Services, pursuant to which J.P.M. was placed in foster care. On that day DYFS received a referral from a Philip Andros, who indicated that he witnessed J.G. punch and kick J.P.M. and grab him by the throat. At that time Frank Unkle, an intake worker with DYFS, went to see *515 the child and observed many marks on his head and throat. When asked what happened, the child said that his daddy did it. Mr. Andros indicated that defendant J.G. grabbed the child by the throat, pushed him to the floor, kicked him and punched him in the chest. Frank Unkle felt a knot on the back of J.P.M.'s head, and observed bruises and abrasions on the left side of his face in the temple area. Thereafter, J.G. signed a voluntary foster-care agreement.
The incident of December 3 was not the first contact that DYFS had with defendant. The first referral came on July 13, 1981, alleging abuse. The evidence established that on that occasion defendant kicked J.P.M., who was then just under two years old. Defendant indicated that he felt the allegations had been exaggerated and that he had the right to discipline and respond to his child as he saw fit, since he was the father. Although he admitted to spanking the child, DYFS felt that abuse could not be substantiated at that time, and closed its case. A second abuse complaint was received on November 30, 1982, with DYFS contacting defendant and the child on December 1. At that time Mr. Unkle observed bruises on the child's buttocks and lower back area. Defendant admitted that he was having problems coping and that he was under a great deal of stress, but declined foster care for the child. He was having difficulty with the child at that time, asserting that the child would not follow his instructions, and that when J.P.M. became frustrated he would act out by urinating or doing things that he was not allowed to do. Mr. Unkle and defendant discussed day-care arrangements, but before such could be arranged the December 3 abuse incident occurred.
J.P.M. has remained in foster care since December 3, 1982. Thereafter, on January 7, 1983, defendant began a course of treatment with Mental Health Services of Cape May County. He was referred by DYFS, to evaluate his ability to parent J.P.M. He was seen for 13 sessions, from January 7, 1983 to August 4, 1983, but throughout the course of treatment repeatedly denied abusing his son and further denied the charge *516 of sexual abuse on another child, for which he was later convicted. He was depressed, anxious, isolated, hurt, enraged and helpless. He blamed the world, New Jersey and DYFS for the problems he was experiencing. The counsellor felt that he was a moderate risk for hurting himself or others throughout the course of treatment. Psychological testing found him to be enraged to the point where the examiner felt the test was invalid due to distortions caused by his anger. In August it was felt that defendant would not be able to profit from therapy until he was able to break through his denial. The counsellor felt that his rage and sense of helplessness and hopelessness were a dangerous combination, and that defendant needed to be in a situation where he was protected from harming himself or others until he had resolved some of his conflicts. On October 4, 1983 defendant was convicted of sexual assault and sentenced to State Prison for a term of seven years, which he is still serving.
The initial foster placement of J.P.M. was terminated by the foster parents after experiencing difficulty with J.G.J.P.M. was then transferred to his present foster placement, where he has resided since May 10, 1983. At the time of J.P.M.'s initial foster placement, the plan of the Division of Youth & Family Services was to place him with family members in the Washington, D.C. area. In implementing this plan DYFS experienced substantial delays. Family members initially contacted concerning J.P.M.'s placement first expressed interest and then were unable to accept him. Delay was also occasioned on the part of officials of the State of Maryland in conducting background investigations of the family in that area. Ultimately, the plan focused on placement with one Regina Dorsey, defendant's aunt. Visits in the fall of 1984 occurred with the aunt, both in Maryland and in New Jersey. Although termination of parental rights would legally end the rights and responsibilities of defendant as J.P.M.'s father, he expressed no opposition provided the child were to be adopted by his relatives. Underlying *517 this was defendant's anticipation that he would continue to maintain contact with the child at the end of his prison term.
The plans for placement with the family were changed by DYFS when it became known in April 1985 that Mrs. Dorsey was terminally ill with cancer. At that point DYFS, being concerned with establishing permanency in J.P.M.'s life, changed its plans and proposed adoption by the present foster parents, with whom J.P.M. has lived since May 1983. Defendant objects to termination of parental rights under these circumstances.
J.P.M. has experienced continuing instability in his life. He is a brown-skinned child born to a white mother and a black father. He has had no contact with his natural mother since approximately April 1980, when she left him with defendant to go to California. Since that time her whereabouts have been unknown. During the period from April 1980 until December 1982 defendant accepted primary responsibility for J.P.M. Since defendant worked, the child was cared for during days by a series of babysitters. When defendant was not working he frequently spent a great deal of time in his single room in a rooming house with the child. Defendant experienced continuing problems in discipline with J.P.M. and responded physically with continued hard spankings. J.P.M. rarely smiled and did not appear to be a happy baby. During the period of foster placement he experienced continuing instability and uncertainty by reason of the problems encountered with placement with defendant's family members in the Washington area. The only substantial stability in his life has come in the present foster home, where, as of the time of trial, he had been living for over two years. As of November 1984, J.P.M. felt well supported by and well connected to the foster family. He was receiving appropriate attention and nurturance, and was demonstrating a recognition of the concern which both his foster parents have for him. He was interested in pleasing them and winning their approval. At the same time, however, he experienced some ambivalence, since he knew that he might not remain in the *518 situation, by reason of plans to place him with relatives in the Washington area. At that time it was the opinion of an examining psychologist that severance of the relationship with the foster parents would introduce a risk that J.P.M. would not be able to be as trusting or well connected to other adults in the future.
The April 1985 inability to place J.P.M. with Mrs. Dorsey as a result of her illness was yet another blow to any sense of stability in the life of this child. A psychological evaluation in May 1985 found his behavior to be significantly less compliant and cooperative than it had been in November. He was wary of entering into close relationships with others and, although he wanted to become close with significant others, he was reluctant to allow this to happen, since he could not trust that others would do what was helpful for him. He had a very strong need for nurturance and support, and would at times exaggerate somatic concerns and behave in negative ways to gain attention from others. As of May he was quite angry and was grappling with basic issues of security and trust. The psychologist felt that these matters could not be dealt with effectively unless some stability in placement is effected.
Inability to develop a permanent placement for J.P.M. will have damaging long-term effects. It is probable that he will have significant difficulties in forming meaningful relationships with others and will be unable to maintain lasting relationships. It is likely that he will have a difficult time cooperating in transactions with others, and will be dominant and controlling. Those same characteristics are evidenced presently in J.P.M.'s acting-out behavior. At present he is very controlling in social situations and has a strong tendency to dictate the terms of the interactions. He tends to show his aggression more openly when adults insist that he comply with a demand.
It is clearly and convincingly in the best interest of J.P.M. that he be placed in a permanent home without further delay. The present home where he is located is one which has provided *519 care and nurturing for over two years, and where the foster parents wish to adopt J.P.M. It represents the only continued nurturing which he has received during his lifetime. Defendant, by reason of his prison sentence, would not be capable of accepting responsibility for J.P.M. for approximately two more years, but even if such were not the case it could not be said that placement with defendant at this time would be a viable alternative. As of the time he went to prison defendant demonstrated no insight into his abusive conduct toward J.P.M. or of the danger such conduct presented. There is nothing in the record to suggest any change in this circumstance as of this time. His testimony at trial was consistent with a continuing denial of abuse.
DYFS seeks to terminate defendant's parental rights and to obtain guardianship of J.P.M. pursuant to N.J.S.A. 30:4C-15(c), which provides that where:
... (c) it appears that the best interests of any child under the care or custody of the Bureau of Childrens Services require that he be placed under guardianship; ....
The burden is upon DYFS to establish its case by clear and convincing evidence. In re Guardianship of B.C.H., 108 N.J. Super. 531 (App.Div. 1970); In re Guardianship of R.G. and F., 155 N.J. Super. 186 (App.Div. 1977).
In order to meet the statutory requirement it is not sufficient that DYFS merely show that it can provide a better home for J.P.M. than can be provided by his father. As held in In re Cope, 106 N.J. Super. 336 (App.Div. 1969):
It is, therefore, incumbent upon the Bureau, or other petitioner for guardianship, to show more than that it will provide a better home for the child. It must demonstrate affirmatively that the child's "best interests" will be substantially prejudiced if he is permitted to remain with his parent  e.g., that his health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change, or that the parent is in some way incapable of caring for the child or unwilling to do so [Id. at 340-341].
The court there noted that N.J.S.A. 30:4C-15 is to be interpreted strictly and in accordance with the following principles of public policy:

*520 (a) that the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare;
(b) that the prevention and correction of dependency and delinquency among children should be accomplished so far as practicable through welfare services which will seek to continue the living of such children in their homes; ....
[Id. at 340].
Notwithstanding the concern for maintaining the biological family, all rights and interests of parents are subservient to the child's best interests. In re Mrs. M, 74 N.J. Super. 178 (App.Div. 1962). Although the rights of the natural parents should not be ignored in adoption proceedings, the best interest of the child is the overriding factor. In re Adoption of D, 78 N.J. Super. 117, 124 (Pro.Div. 1963). "The court will not regard parental rights as controlling when to do so would imperil the personal safety, morals, health or happiness of the child." A v. M, 74 N.J. Super. 104, 124 (Pro.Div. 1962) (quoting Richards v. Collins, 45 N.J. Eq. 283, 287 [E. & A. 1889]).
In In re J.R. Guardianship, 174 N.J. Super. 211 (App. Div. 1980), certif. den. 85 N.J. 102 (1980), the court was faced with weighing the rights of a child as opposed to the rights of a parent who was in no way morally culpable. The court said:
There can be no solution satisfactory to all in this kind of case. Justice to both mother and child, the desired objective, can only rarely be attained where, as here, the best interest of one is only achieved at the expense of the other. Where courts are forced to choose between a parent's right and a child's welfare, they choose the child by virtue of their responsibility as parens patriae of all minor children, to protect them from harm. [Id. at 224.]
A child's psychological interest may be considered in determining whether to terminate parental rights. The absence of physical abuse is not dispositive of the issue of custody. In re Guardianship of R.G. and F., 155 N.J. Super. at 194. The court may consider whether psychological harm would result from removing the child from the present home. Sorentino v. Family & Children's Soc. of Elizabeth, 72 N.J. 127, 131 (1976); In re Adoption by A.M. & L.M., 170 N.J. Super. 320, 332 (App.Div. 1979). In Sorentino the court recognized the serious psychological harm in uprooting a child from an adoptive home and transferring custody to the natural parents, in view of the *521 period of time that the child was in the only real home he had known. Sorentino, 72 N.J. at 137.
Our courts have also recognized the importance of the psychological parent. In Sees v. Baber, 74 N.J. 201 (1977), the court noted:
It has been recognized that the psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood. [Id. at 222.]
In deciding In re J.R. Guardianship the court found that the parent/child relationship was so strong with the foster parents that it would be better for the child to terminate the biological parent/child relationship despite the absence of present or past parental unfitness. It noted that decisional law strongly suggested a finding of parental unfitness in order to terminate parental rights. In re Guardianship of B.C.H., 108 N.J. Super. at 539; J. and E. v. M. and F., 157 N.J. Super. 478 (App.Div. 1978). However, the statute did not require the disruption of the psychological parent/child relationship if the child was happy and thriving in the foster home. In re J.R. Guardianship, 174 N.J. Super. at 223.
In this case the evidence has established past instances of abuse by defendant against J.P.M., which necessitated the initial foster placement. Return of J.P.M. to his father was frustrated by defendant's unsuccessful participation in professional counseling and by his subsequent imprisonment for abuse of another child. Defendant is presently incapable of caring for J.P.M. by reason of his incarceration and because there is no evidence to suggest that his attitude toward parenting has changed from the time prior to his incarceration to the present.
Because of the inability of defendant to care for him, J.P.M. has experienced continuing instability in his life. This has substantially prejudiced his best interests. Continued instability will result in long-term psychological harm. J.P.M. is presently in a foster home where he has lived for over two years, which represents the only non-abusive, real stability he has *522 known in his life. The home is supportive and caring, and the foster parents wish to adopt him.
In the circumstances of this case DYFS has clearly and convincingly established that pursuant to N.J.S.A. 30:4C-15(c) the best interests of J.P.M. require that the parental rights of defendant be terminated and that J.P.M. be placed under its guardianship.
Counsel for DYFS will submit an appropriate order.