217 N.J. Super. 1 (1987)
524 A.2d 1255
IN THE MATTER OF THE GUARDIANSHIP OF J.E.D.
Superior Court of New Jersey, Appellate Division.
Argued December 10, 1986.
Decided January 27, 1987.
*2 Before Judges KING, DEIGHAN and HAVEY.
Joseph M. Pinto, Assigned Counsel, argued the cause for appellant (Joseph F. Polino, of counsel).[1]
Lisa B. Landsman, Deputy Attorney General, argued the cause for respondent, Division of Youth & Family Services (W. Cary Edwards, Attorney General of New Jersey, attorney; James J. Ciancia, of counsel).
The opinion of the court was delivered by KING, P.J.A.D.
This proceeding for termination of parental rights and commitment of a child to the guardianship of the Division of Youth and Family Services (DYFS), "pursuant to N.J.S.A. 30:4C-15 through N.J.S.A. 30:4C-22 and R. 5:12," resulted in an order in favor of the Division. On May 20, 1986 the judge committed the child to the "guardianship and control of the Division" pursuant to the statutes and terminated parental rights. Because of certain interim developments and procedural concerns with the record, we conclude that the interests of justice require a reversal and a remand for a prompt supplementation of the record, and reconsideration of the judge's oral decision of April 29, 1986 in light of these concerns.
*3 This is our view of the proceedings to date. A DYFS worker took M. (Mary[2]) from her mother (Jane) on December 1, 1982. That day DYFS filed a protective services complaint against Jane for abuse and neglect of Mary. The family court judge signed orders on December 16, 1982 and March 15, 1983 continuing Mary in the custody of the Division. Jane was ordered to undergo a mental health evaluation. Following a fact-finding hearing the judge found that Jane abused Mary within the meaning of the N.J.S.A. 9:6-8.21 et seq. and signed an order on June 10, 1983 continuing Mary in the custody of DYFS for a period of six months and ordering Jane to undergo therapy. The judge signed orders maintaining Mary in the custody of DYFS on December 15, 1983 and March 5, 1985.
On April 16, 1985 DYFS filed a complaint for guardianship of Mary. A hearing was held before the family court judge on September 19, 1985 and November 7, 1985. On April 29, 1986 he rendered an oral decision and signed a final order for guardianship with DYFS on May 20, 1986. This appeal followed.
A motion to stay the court's judgment of guardianship was heard and denied by the judge on July 11, 1986. On August 18, 1986 the judge signed an order denying Jane's request for reinstatement of visitation privileges pending appeal but enjoined any adoption proceedings pending this appeal.
By order of October 7, 1986 we permitted the supplementation of the record by DYFS with an affidavit by foster parent Barbara Smith which stated in full
Barbara Smith [fictitious] of full age, being duly sworn according to law, upon her oath deposes and says:
1. I am the foster mother for [Mary].
2. [Mary] has lived in my home since December 1, 1982 except for the period of time of August 30, 1983 through October 13, 1983.

*4 3. Prior to the guardianship hearing for [Mary], I stated that I was not interested in adopting [Mary] because her biological mother knew where I lived and had threatened to kidnap [Mary] if I tried to adopt her.
4. On April 30, 1986, I was advised by a Division worker that the Division had been granted guardianship of [Mary] the day before. I advised the worker immediately that my husband and I wished to adopt [Mary] I also told the worker that I really always wanted to adopt [Mary] but I did not want the child's biological mother to know this.
Her husband, the foster father, filed a parallel affidavit; both were dated September 16, 1986.
These are the facts we glean from the record. Jane was a foster child most of her life and became a mother at age 19 on July 3, 1982. She was unmarried and the child's father was not involved in helping to care for Mary. When Mary was a newborn, mother and daughter lived with Jane's former foster parents. About three months later they moved in with two friends of Jane's. In November 1982 Jane went with a friend to DYFS for help. She told a social worker there that she was having trouble taking care of her daughter and that she had hit her hard enough to leave a mark. She wanted help in order to stop hurting her daughter. She also asked for help finding her own place to live. DYFS later received a anonymous phone call about Jane and apparently a second phone call from a woman who knew Jane from a parents' "anonymous group" where Jane was seeking help. DYFS sent a social worker to visit Jane and Mary on December 1, 1982.
The social worker saw that Jane was not properly caring for Mary. For example, she noticed Jane making cereal from hot milk and feeding it to the baby without testing the temperature. Jane told the social worker that she was trying to find a place to live on her own. The social worker told Jane that she felt Jane was not ready for that and tried to get Jane to voluntarily sign a foster care agreement but Jane refused. Jane then became very angry and locked herself with Mary in the bedroom. When Jane came out of the bedroom she hit the social worker. Mary was then taken from Jane and placed in a foster home.
*5 DYFS filed a complaint for abuse and neglect on December 1, 1982. Jane voluntarily went to live at Mission Teen, a residential treatment program for drug, alcohol or emotional problems. (There is no evidence that she had a drug or alcohol problem). Mission Teen forbade her to visit Mary and she voluntarily left on January 28, 1983. She had received a scholarship for cosmetology school which she could use only if she lived in Gloucester Township. She was unable to find housing in Gloucester Township and never attended that school but instead she moved in with friends, the Schueles in Pine Hill. She tried working at McDonald's but was unable to keep the job because she had trouble operating the cash register. During this period she visited with Mary and also attended high-school equivalency classes in Camden. The Schueles supported her financially and assisted her with transportation to classes and to visit Mary.
Initially, from December 1982 to March 1983 DYFS scheduled Jane's visitations with Mary for once a month. From March until the following September she visited Mary regularly, usually once a week at the DYFS office for about an hour. A few visits were cancelled, some by Jane, some by the foster parents. The visits went very well. She changed her daughter's diaper, fed her with a bottle, and was happy to see her. Starting in June 1983 she attended court-ordered counseling at Treatment Alternatives for Families with Children at Risk.
On June 29 the agency increased the visitations to two hours a week. In July, the agency began to allow Jane to have visits outside of the office. On July 13, 1983 Jane had a birthday party for Mary with her family and the Scheules which went well. On September 21 DYFS allowed Mary to visit her mother in her grandfather's home for six and one-half hours. This visit also went well. Jane also continued to attend counselling regularly.
In April of 1983 Jane became pregnant. She told the DYFS social worker she had been raped in Philadelphia. The social *6 worker noticed that she did not seem upset and that she had not informed the police of the incident. Later Jane named Robert Hunt as the father. A couple of months after she became pregnant she met her future husband, Alvin Gaylord, at the Living Waters Community Fellowship, a religious group. Jane said that they met on a Sunday and that "he fell in love on Monday and proposed on Tuesday."
In August she began to have problems with the Schueles and moved to her father's home. DYFS moved Mary to a foster home nearer to Jane to make visits more convenient. However, the placement did not work out and Mary was eventually moved back to her original foster parents. Living with her father did not work for Jane; the reasons why are disputed. She told a social worker that her father had thrown her out of the house for coming home an hour late. She also said she had spent a night at a hotel in Philadelphia and a night on a park bench but later said that this was not true.
A few nights after Jane left her father's house, she and Gaylord decided to move to Florida where Gaylord had an opportunity to attend data entry school. DYFS advised her that this would make the return of her daughter less likely.
Jane's situation did not improve while in Florida. She gave birth to her second daughter, Victoria. Her new husband beat her, but did not beat the child. The family attended counselling but did not make much progress. They lived in a trailer which they had thought was a wedding gift but which the owner took back several months later. They stayed with a minister from their church and eventually found another trailer. Alvin Gaylord abused Jane so severely that she and Vickie had to spend some time in a shelter. He had difficulty in holding a job and paying the rent. However, throughout all of this Jane was able to take care of Vickie, who appeared to be thriving. She also kept in touch with Mary and DYFS in New Jersey but social workers in Florida did not feel she could handle the stress of having Mary returned to her at that time. They were concerned *7 with Jane and Alvin's coping skills and lack of common sense.
Jane returned with Vickie to New Jersey in June 1984 where they stayed with Jane's father. She had her first visit with Mary on July 2, 1984 and visited with her seven times between her return home and November 1984. She also kept in close contact with DYFS. She had difficulty in arranging transportation for the visits because she relied on her father to drive her but sometimes he was unable to take her. Apparently DYFS could have provided transportation if Jane had requested it, but we infer that Jane was unaware of this.
Jane returned to Florida in November. She stayed only until December 1984. Between December and June of 1985 she did not visit Mary often. She again returned to Florida to try to reconcile her marriage.
During one of the 1984 visits Mary did not seem to recognize Jane who was upset that Mary did not call her "mommy." During September and October 1984, Jane, Vickie and Jane's father attended a four-week program called Foster Parents as Partners. During the program Vickie was crawling on the floor and Jane hit her hands to make her stop. Social workers told her that this was inappropriate. Jane was upset by this and said that she also hit Vickie (who was then ten-months old) on the hands during toilet training.
The Division transferred Mary's case to the DYFS Adoption Office in February 22, 1985. Jane visited with Mary on June 7, 1985. At that visit Jane's social worker said that she seemed more interested in talking to her than playing with Mary. Jane became very angry when discussing her husband, her own father, and Vickie's father. During the first few minutes, Jane tickled Mary and tried to make Mary kiss her. She would not release Mary, who finally kissed her mother and was released. During most of the visit, Jane seemed insistent on controlling all phases of Mary's play, giving directives and becoming angry when Mary played with Vickie's toys. Jane became annoyed *8 when Mary could not pronounce Vickie's name or her own name. The social worker was concerned about the rigidity in Jane's expectations of her daughter. She said that there was no real display of affection between them. Jane again went to Florida to reconcile with her husband. While there she telephoned DYFS once a month during June, July and August 1985. Jane came back to New Jersey in either August or September 1985.
As noted, on April 16, 1985 DYFS had filed a complaint for guardianship of Mary. The initial hearing was held on May 21, 1985. Jane was present. Trial was held before the family court judge on September 19, 1985 and November 7, 1985.
The psychiatrist who testified as an expert, Leroy J. Byerly, M.D., had examined Mary, her mother and her foster mother. Byerly expressed his concerns about Jane and testified that Jane gave mixed messages regarding her plans for Mary. For example, Jane said that she planned to return to her husband in Florida but also said that she might live in New Jersey.[3]
Byerly discussed two areas of concern if Mary were returned to her mother. First he discussed Jane's unsettled living situation because of her unstable past. Byerly also discussed Jane's ambivalence which could lead to impulsive behavior and difficulty in making choices. Byerly was further concerned about Jane's ability to make common sense or reality judgments. Jane apparently told Byerly that her relationship with her husband was positive and spoke about the marriage as a good one.
Byerly's second area of concern was Jane's "inter-psychic conflicts" and the effects of returning Mary to her in terms of what meaning Mary has for Jane. He said, she had "at least mixed feelings towards the child" prior to Mary's removal from *9 her. How those feelings would emerge if Mary were returned home concerned the doctor. He also critized Jane's relationship with the younger child; he said that Jane was over-involved with Vickie. (No one suggested that she could lose custody of Vickie). Additionally, he testified that simply because one child in a family is well treated does not indicate that another child would be well treated. Byerly stated that should Mary be returned to her mother "... her growth and development will stop; that she will be restricted, that she will not be able to develop her own potentials in the same environment, ..." Additionally, Byerly stated that even if Jane were given a six-month period to actively participate in a therapeutic situation, she would still experience problems with her "inner-psychic conflicts." The doctor still would not recommend that the child not be returned to her mother.
The doctor found that Mary's foster mother was her psychological parent and predicted major depression when Mary was removed from her foster mother which could result in restricting normal growth and development. To mitigate the effects of removal he believed the child should be placed in an environment something like the one she is used to. He felt that it was important that Mary have stability and parents who can set some limits. He thought the age range of four to six years would be the most appropriate time to move Mary. However, he did think it important that the decision be made soon so that Mary could be told of the change, prepared for it and helped to understand the reason for it. He also said that Mary would miss her mother if she was never allowed to see her again. Byerly expressed his opinion that there was a 30% chance of success if the child were to be placed with her mother even with psychological or psychiatric monitoring. He did not feel that Jane would physically abuse Mary. Byerly stated in his written report that there was a bond between Mary and her foster mother and found there was a lack of spontaneity between Jane and her daughter.
*10 At the hearing, Jane testified that she was planning to divorce her husband but vacillated on her other plans. She stated that she did not want to work but that she wanted to care for Vickie and then said she would take any job she could get. Jane is receiving welfare. She was then renting her father's home under a two-year lease and a girlfriend is living with her. Her plans to pay the bills were disorganized.
During the trial DYFS represented to the judge that the foster parents had declined to adopt Mary if she became available for adoption because of their concern that Jane knew where they lived, and because of their age and health. As noted, following the trial, the foster parents informed DYFS that they had been frightened of Jane and were afraid to express their desire to adopt Mary. However, pending this appeal they have expressed a strong desire to adopt the child. On April 29, 1986 the judge granted guardianship of Mary to DYFS. The judge placed special emphasis and weight on the testimony of Byerly. The judge found that
the evidence is such in this case that I am required... to grant the guardianship.... The unfortunate record of the natural mother since the taking of this child is such that I think that it is unlikely that she will ever be able to be in a situation where she, herself, can render the necessary things that are required for this very special child to be able to try. And, for the reasons stated, the guardianship is granted.
The judge signed the order for guardianship on May 20, 1986. The defendant filed a notice of appeal on June 17, 1986. On July 11, 1986 a motion to stay the court's judgment for guardianship was heard before the family court judge. At that time, it was made clear on the record that Mary's foster parents had expressed their desire to adopt her. The judge denied Jane's request to stay the guardianship and denied her request for visitation privileges. On August 18, 1986 the judge signed an order denying Jane's request for reinstatement of visitation privileges with Mary pending the appeal but enjoined any adoption proceedings pending determination of the appeal.
*11 There is an almost unresolvable conflict which courts face in deciding parental termination cases. As the New Jersey Supreme Court explained in a decision issued on July 30, 1986
On the one hand, we emphasize the inviolability of the family unit, noting that "[t]he rights to conceive and to raise one's children have been deemed `essential' ... `basic civil rights of man' ... and `rights far more precious ... than property rights'...." Stanley v. Illinois, 405 U.S. 645, 651 [92 S.Ct. 1208, 1212, 31 L.Ed.2d 551] (1972).
... On the other hand, it has been recognized "that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." Parham v. J.R., 442 U.S. 584, 603 [99 S.Ct. 2493, 2504, 61 L.Ed.2d 101] (1972). [New Jersey DYFS v. A.W., 103 N.J. 591, 599 (1986)].
We must keep in mind the permanence and severity of a termination of parental rights. As Justice Blackmun said, "In [these] case[s], the State's aim is not simply to influence the parent-child relationship but to extinguish it. A termination of parental rights is both total and irrevocable. Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child, to participate in, or even know about, any important decision affecting the child's religious, educational, emotional, or physical development." Lassiter v. Dept. of Social Services, 452 U.S. 18, 39, 101 S.Ct. 2153, 2165, 68 L.Ed.2d 640 (1980) (Blackmun, J., dissenting).
The federal Constitution requires that the state prove the grounds for termination of parental rights by clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 747-748, 102 S.Ct. 1388, 1391-1392, 71 L.Ed.2d 599 (1982) (Blackmun, J.); accord, N.J. DYFS v. A.W., 103 N.J. at 611-612 citing, In re Guardianship of R.G. & F., 155 N.J. Super. 186, 192 (App.Div. 1977). In this case, DYFS sought to terminate Jane's parental rights on the grounds that it would be in the "best interests" of Mary. N.J.S.A. 30:4C-15(c). DYFS also sought to terminate Jane's parental rights on the basis of parental failure "for a period of more than one year to maintain contact with and plan for the future of the child...." Id. at 15(d). The State attempted to prove that Jane's conduct indicated that she did *12 not have a sincere motivation to preserve her parental relationship. See N.J.S.A. 30:4C-15(d).
The family court judge did not find that Jane had foresaken her parental rights nor would the record support such a finding. Jane has shown a real interest for the well being of her daughter and a sincere desire to regain custody of her since the initial order was entered in 1982. She voluntarily went to DYFS because she was concerned with her ability to care for the child. She initially had monthly, then weekly, visitations with her child from December 1982 through September 1983. Although the visits became less frequent after that, this was in part because she was travelling back and forth to Florida in an effort to save her marriage and provide a better home environment if she eventually did receive custody of Mary. There was testimony of numerous telephone conversations between the mother and DYFS workers regarding her daughter. When she was in New Jersey she made continued efforts to visit with Mary. She also showed a desire to cooperate with DYFS and participated in counselling and other programs at its request.
The judge's decision to terminate Jane's parental rights was based on N.J.S.A. 30:4C-15(c)  that it was in the best interests of the child. This standard is more complex than the simple language used to express it indicates. Our Supreme Court recognizes that were "the sole criterion stated to be in terms of the best interests of the child, it would be suspect for vagueness because of the important constitutional interests involved." N.J. DYFS v. A.W., 103 N.J. at 601. The trial judge must determine that "the child's health and development have been or will be seriously impaired by the parental relationship." A.W., 103 N.J. at 604. Also the State must show more than that the State's care has proved more beneficial to the child than the care that could be provided by the parents. Id. at 603, citing In re Cope, 106 N.J. Super. 336, 340 (App.Div. 1969).
In A.W., the court held that a trial court should be careful not to decide a case because of a cultural bias or because of the *13 parents economic or social circumstances. 103 N.J. at 594, 604. See Doe v. G.D., 146 N.J. Super. 419, 431 (App.Div. 1976). For example, an assumption that most children live in a nuclear family with two parents would be false. One out of three white children and four out of five black children live with only one parent at some point of their lives. Fanshel, Urging Restraint in Terminating the Rights of Parents of Children in Foster Care, 12 N.Y.U.Rev.L. and Soc.Change, 501 (1983-84).
Using facts that indicate poverty as a basis for a finding of child neglect or abuse "might result in mass transfers of children from ghettos and disadvantaged areas into more luxurious living accommodations but with the resultant destruction of the natural parental bond." Doe v. G.D., 146 N.J. Super. at 431. The Court in A.W., explained that "[T]he primary focus of the court should be upon harm for which there is `unambiguous and universal social condemnation'." Id. 103 N.J. at 604 quoting, Developments in the Law  The Constitution and the Family, 93 Harv.L.Rev. 1156, 1314 (1980). The Court said that these harms clearly include emotional harm. But, "[n]ot every injury  real or imagined  to the child's psyche satisfies the test." Id. at 605.
While it is clear that Jane physically abused Mary to an extent when she was an infant and that it may well have been proper to remove Mary from Jane's care at that time, there is no evidence that Mary's health and development has been seriously impaired by her relationship with her mother. Further, Dr. Byerly testified that he did not believe that Jane would again physically abuse Mary. However, we have pointed out that "the absence of physical abuse or neglect is not conclusive...." In re Guardianship of R.G. and F., 155 N.J. Super. 186, 194 (App.Div. 1977).
The question in this case is whether the State proved by "clear and convincing" evidence that the return of Mary to her mother would be so psychologically injurious to her that it would never be a realistic option. The burden was on the State *14 to prove that "the parents are unable or unwilling to eliminate the harm and delaying permanent placement will add to the harm." A.W., 103 N.J. at 605. The Court in A.W. explained that
A court analyzing the ability of the parents to give their children care should not look at the parents to determine whether they are themselves unfit or whether they are the victims of social circumstances beyond their control; it should only determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care. No more and no less is required of them than that they will not place their children in substantial jeopardy to physical or mental health. [Id. at 607.]
The judge's findings on this point were that, because of the special needs of the child, the mother would not be in position to give the quality of care required by the child in a new home. He did not state on the record what these "special needs" were, or what the harms would be. He went on to discuss the fact that Jane had been a foster child herself and had experienced some of the same problems that her daughter was now experiencing. These findings apparently were based on Byerly's testimony that, in light of the fact that Mary would have to be moved because her foster parents could not adopt, she should be placed in a home similar to that existing with the foster parents (preferably a two-parent family) to mitigate potential trauma upon separation. The doctor's main concern about the mother's ability to care for the child was her tendency to over-mother, to be too restrictive and to try too hard. He also felt such conduct evinced a certain ambivalence by the mother to the child, which he defined as having mixed feelings or opposite emotions regarding the child, such as a love-hate relationship.
In support of this opinion Byerly referred to a "derivative of ambivalence," which he explained as the tendency to overcompensate or be overly involved with the child. The fear that he expressed was not that the child would manifest some sort of anti-social behavior if she was put back into her natural mother's life, but that she would be restricted; she would not develop her potential the same way she might have. The *15 record is unclear whether the judge found that this constituted the serious impairment to the child's development required by law to terminate Jane's parental rights. It also is unclear whether the judge made a finding of fact that Mary's emotional growth would stop if returned to her mother.
Byerly testified that this is not the best time to move Mary because of her level of emotional development. He testified that she should not be moved until she reached about age five. Byerly was not able to predict with any degree of certainty whether Mary would be harmed if the child was returned to her mother gradually over a period of time at the best time for such a transfer.
The Supreme Court in A.W. stated that a trial court should consider alternatives to termination, id. at 608, and described the factors a court should consider.
Some factors that suggest that efforts to reunite the family "are no longer reasonable" include "parents [who] refuse to engage in therapy or other services;... parents [who] cannot benefit from therapy or instruction due to mental retardation or psychosis; .. . parents [who] threaten workers, child, foster parents, or therapists; ... another child in the home is abused or neglected and taken into care; . .. [and the] child shows serious adverse reaction to contact with parent ..." quoting Ducote, Why States Don't Terminate Parental Rights, Justice for Children 3 (Winter 1986). [Id. at 610].
Here the judge concluded that it was unlikely that Jane would ever be able to be in a situation where she could give the care necessary for this "very special child." He did not support this conclusion with any analysis of the facts that showed that Jane refused to engage in therapy or was unable to benefit from therapy due to mental retardation or psychosis, or any of the other factors discussed in A.W. The record shows that Jane is able to care for her second daughter, Vickie. Also Byerly stated that if Jane underwent further counselling or psychiatric therapy her abilities would improve.
The judge may not have fully considered alternatives to termination. A final separation from a biological parent is a harm in itself. Byerly testified that Mary would feel a sense of loss if her relationship with her natural mother was terminated. *16 Experts are increasingly concerned about the seriousness of this loss and are recognizing the need for continued contact with a biological parent, even a flawed parent. "The child's profound need to know who her parents are, where they came from, the conditions under which they could not take care of her, is not addressed by the [existence of a] psychological parent." Fanshel, Urging Restraint in Terminating the Rights of Parents, 12 N.Y.U.Rev.Law and Social Change at 503; see, Wald, State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights, 28 Stan.L.Rev. 623, 655 (1976). Our courts have recognized that a child's relationship with a parent is of such significance that doubts are to be resolved against its destruction. In re Adoption of Children by D., 61 N.J. 89, 93 (1972).
The Court in A.W. mandates that "the termination of parental rights will not do more harm than good." Id. 103 N.J. at 610. This conclusion is not evident from our view of the record if Mary's foster parents do not adopt her. We also must consider that a new set of considerations may enter into the decision to terminate parental rights where the child has been in foster care and has developed a "parent-child" relationship with her foster parents. This is because destruction of such a relationship is itself a harm to the child. A.W. at 611. This harm must be considered even though the natural parent is entirely blameless in the loss of custody of the child and would be a good parent. Sorentino v. Children's Society of Elizabeth, 72 N.J. 127, 133 (1976); In re Guardianship of D.C.E. and A., 169 N.J. Super. 230, 241 (Cty, Ct. 1979); In re Guardianship of J.P.M., 210 N.J. Super. 512, 521 (Ch.Div. 1986) (the courts have recognized the importance of the psychological parents and parental rights may be terminated even where they are not unfit); See Sees v. Baber, 74 N.J. 201, 220 (1977).
*17 In this case Mary has formed a psychological parent-child relationship with her foster parents. Byerly was concerned about the damaging psychological effects of separating Mary from her foster parents. If the foster parents cannot adopt, this harm could not be avoided by terminating Jane's parental rights. But if the foster parents can adopt then the harm can be avoided and perhaps Mary can be given the continuity and stability that is so important to a child.
Having said all of this, we acknowledge that this is a most difficult case which has been handled ably at the trial level by one of our State's most capable family court judges. Our review of the record shows the fluid nature of the facts and the applicable law in these cases, which are often never in a static, fixed or final circumstance.
We conclude that a remand for reconsideration and, if necessary, additional testimony is advisable for several reasons. If the foster parents are indeed ready and able to adopt, a new and influential factor is introduced into the "best interests" equation. Further, our Supreme Court's decision in New Jersey DYFS v. A.W., decided on July 30, 1986, just three months after the judge's decision to terminate, for the first time gives us a fully articulated "standard for the termination of parental rights under N.J.S.A. 30:4C-15 and -20," 103 N.J. at 594, from our highest Court.
Moreover, we are left with more than a nagging doubt that the record as we presently find it does not meet the federal constitutional procedural burden of proof required by Santosky v. Kramer, supra. Perhaps on remand the trial judge, through a more thorough explication of his analysis of the record or through additional testimony, will convince us that the nagging doubt is falsely-rooted. On what we see now before us by way of evidence and analysis of the record, we presently conclude that the constitutional standard has not been met. The re-entry of the foster parents as possible adoptive parents could, of course, reshape this analysis. Finally, the judge may consider *18 it appropriate to reexamine the mother's present circumstance, which has been represented to us as more stabilized than in the past.
Reversed and remanded for prompt proceedings harmonious with this decision. The mother's right to visitation will be reinstated pending final judgment. We do not retain jurisdiction but on the filing of any future appeal, prompt notice to the Presiding Judge will insure a quick argument date and decision after accelerated briefing.
Reversed and remanded.
NOTES
[1] We commend Mr. Pinto for his uncompensated pro bono services rendered skillfully on behalf of appellant in this case.
[2] The names of the mother, child and foster parents are anonymous.
[3] At oral argument from counsel's representation, we conclude that Jane now remains permanently in New Jersey and that her relationship with Alvin Gaylord is ended.