**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2898-14T1

NORTH JERSEY MEDIA GROUP, INC.,

    Plaintiff-Appellant,

v.

IC SYSTEM SOLUTIONS, INC., COMPUTER
NETWORK SOLUTIONS, LLC, PHILIP NOLAN,
NANCY NOLAN, and THE ESTATE OF PETER
VAN LENTEN, JR.,

    Defendants-Respondents.

_____

Argued December 7, 2016 — Decided August 30, 2017

Before Judges Accurso and Manahan.[1]

On appeal from Superior Court of New Jersey,
Law Division, Bergen County, Docket No. L-
2791-13.

---

[1] Hon. Carol E. Higbee participated in the panel before whom this case was argued. The opinion was not approved for filing prior to Judge Higbee's death on January 3, 2017. Pursuant to R. 2:12-2(b), "Appeals shall be decided by panels of 2 judges designated by the presiding judge of the part except when the presiding judge determines that an appeal should be determined by a panel of 3 judges." The presiding judge has determined that this appeal shall be decided by two judges.

Samuel J. Samaro argued the cause for appellant (Pashman Stein, attorneys; Mr. Samaro and Adam B. Schwartz, on the brief).

John R. Dineen argued the cause for respondents IC System Solutions and Philip and Nancy Nolan (Netchert, Dineen & Hillmann, attorneys; Mr. Dineen and Matthew P. Posada, on the brief).

Giuseppe Franzella argued the cause for respondent Computer Network Solutions (Lazer, Aptheker, Rosella & Yedid, PC, attorneys; Christina M. Rosas, on the brief).

Respondent Laurie Van Lenten, on behalf of the Estate of Peter Van Lenten, Jr., joins in the brief of respondents.

PER CURIAM

Plaintiff North Jersey Media Group, Inc. appeals from the entry of summary judgment dismissing its complaint for fraud, consumer fraud, unjust enrichment, civil conspiracy and conversion against defendants Computer Network Solutions, LLC, IC System Solutions, Inc., Philip Nolan, Nancy Nolan and the Estate of Peter Van Lenten, Jr. North Jersey also appeals from the denial of a discovery motion and a motion to amend its complaint.

Because we find the motion record on summary judgment reveals material facts in dispute and that viewing the facts most favorably to North Jersey makes clear it has produced sufficient evidence to put its claims of fraud, consumer fraud,

2                                                          A-2898-14T1

unjust enrichment and civil conspiracy before a jury, we reverse the order of summary judgment on those counts. We also conclude the trial court mistakenly exercised its discretion in denying North Jersey's discovery motion and direct the court to consider North Jersey's motion to amend its complaint on remand. We affirm the grant of summary judgment dismissing North Jersey's claim for conversion.

We present the facts in the light most favorable to North Jersey and give it the benefit of all favorable inferences in support of its claim. R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). North Jersey is a media company publishing daily and weekly newspapers and maintaining two news sites. Computer Network Solutions is a technology company providing equipment and services designed to "maintain and safeguard" their customers' "business-critical IT operations." Philip Nolan is a fifty percent owner of Computer Network Solutions.[2] Nolan and his wife, Nancy, created IC

---

[2] Nolan apparently sold his interest in Computer Network Solutions to his partner, Alan Cook, for $2,000,000 in 2013. Cook sold Computer Network Solutions for $10,000,000 to another entity in 2014 during the pendency of this suit. The trial court denied North Jersey's motion to amend its complaint to add Cook as a defendant when it granted summary judgment to all defendants, deeming the motion moot. In light of our disposition of the appeal, we vacate that order and remand the motion for consideration on the merits.

System, a smaller company offering the same products and services as Computer Network Solutions. The two companies share office space, refer business back and forth and frequently work projects together.

In 2009, North Jersey fired its Vice President of Information Technology, Peter Van Lenten, Jr.,[3] who had been with the company for over twenty years. In the wake of Van Lenten's firing, North Jersey discovered the hard drive had been removed from Van Lenten's office computer, his administrative assistant had a brand new company laptop she was not authorized to possess and North Jersey could not figure out why it made three large payments to IC System totaling over $130,000.[4]

---

[3] Van Lenten died in 2010 before North Jersey instituted this action.

[4] When Bryan Shaughnessy, a network analyst responsible for networking at North Jersey, inquired about the payments with Phil Nolan, Nolan told him that $77,195.49 was for a two-year Network and Security Monitoring contract and $44,298 was for an annual On-Demand Hardware Support contract. Shaughnessy replied that Nolan's network and security monitoring equipment "was taken off line long ago" and that North Jersey had not "corresponded with [Computer Network Solutions'] technical people in possibly several years in regards to the [n]etwork and [s]ecurity [m]onitoring," and asked whether Nolan could explain why North Jersey "is paying for a service when it is clearly not in use." Shaughnessy also wrote he was "shocked to see" that North Jersey was paying for on-demand hardware support for the network for which Shaughnessy was responsible and asked if Nolan could tell him "if [North Jersey] has ever utilized this support (any dates/examples)?" Nolan never responded. At deposition,
(continued)

Those irregularities precipitated its investigation into Van Lenten's management of North Jersey's multi-million-dollar technology budget and his relationship with Phil Nolan, a principal of both IC System and Computer Network Solutions. What it found prompted this lawsuit.

North Jersey learned that Van Lenten had over the course of several years regularly evaded company policy that all contracts over $10,000 be reviewed by North Jersey's legal department, and that he purchased millions of dollars of goods and services from IC System and Computer Network Solutions on North Jersey's behalf without written contracts. North Jersey also learned that Van Lenten had a close personal relationship with Nolan. The two met weekly for drinks, paid for by Nolan, had lunch together at least three times a month and met for dinner four times a year. Nolan's companies also paid for a couple of expensive, out-of-state fishing trips for Van Lenten. Following its investigation, North Jersey instituted this suit alleging

Van Lenten abused his position of trust and breached his fiduciary duties to allow IC System and Computer Network Solutions to steal more than a million dollars from the company.

Specifically, North Jersey alleged that IC System and Computer Network Solutions swindled it in connection with at least four different projects undertaken at Van Lenten's request: a security camera upgrade at North Jersey's printing facility; the sale and installation of LibertyNet software; payment card scanning; and network security and monitoring. North Jersey put forth the following facts in support of those claims in opposition to defendants' summary judgment motions.

Security Camera Upgrade

Although Nolan and IC System had no experience installing security cameras and Computer Network Solutions had never performed a camera installation on the scale North Jersey required, Van Lenten hired them for a project to install thirty new cameras, ten in the press room and twenty in the mailroom in North Jersey's Rockaway facility at a cost of $109,865 and eighteen Pelco brand cameras and associated equipment outside the building and in specified common areas for $172,000. Van Lenten also authorized a purchase order for spare cameras and accessories as well as a Pelco Constant Scan Camera and an

annual maintenance contract for the camera system at a cost of $33,000 per year.

North Jersey's facility manager, Frank Devetori, certified that he was the one who advised his superiors that the security camera system in Rockaway was outdated and should be replaced. He researched options for upgrades and obtained a quote from a vendor the company had previously used for security camera work. Although Devetori claimed the security cameras were his responsibility, he averred that Van Lenten took over the project, shutting Devetori out, and brought in Computer Network Solutions and IC System to do the work without soliciting other bids. Devetori claimed Computer Network Solutions and IC System performed the work on nights and weekends, a highly unusual practice for such planned upgrades, which he posits was done to avoid his observation of the project.

When Devetori reviewed the bills for the project after Van Lenten was fired, he was shocked. Based on the quote he received from the company's former vendor, he expected the project to cost less than half of what Computer Network Solutions and IC System billed North Jersey. He also certified that North Jersey did not get everything it paid for. He could only account for half the Pelco cameras Computer Network Solutions and IC System claimed to have installed and none of

the spares and accessories beyond the Constant Scan Camera. Devetori also claimed that he was responsible for maintenance of the system, and that neither Computer Network Solutions nor IC System ever serviced the camera system to his knowledge.

Yigal Rechtman, a certified public accountant and certified fraud examiner specializing in information technology, retained by North Jersey to provide expert testimony in the matter, reviewed the invoices Computer Network Solutions and IC System submitted to North Jersey against Computer Network Solutions' purchase orders for the equipment. Corroborating Devetori's certification that North Jersey only received half of the Pelco cameras it paid for, Rechtman could only find purchase orders for eight Pelco cameras and associated equipment.

Rechtman also found that Van Lenten authorized payment of IC System's invoice for $35,174.90 for a replacement camera that should have been included in the supposed spare-parts maintenance plan for which North Jersey paid $36,230.16. He also reported that Van Lenten repeatedly "modified the budget coding for the account associated with the payment for the purported service" and that such conduct is consistent with attempts to conceal payments and "avoid budgetary outliers, as would be the case in a purchasing fraud."

Jeffrey Zwirn, the expert North Jersey retained to testify on the design and installation of electronic security and video surveillance systems, inspected the Rockaway facility and reviewed schematics provided by Computer Network Solutions and IC System. He concluded, among other things, that neither Company had the required New Jersey licenses for design and installation of a closed-circuit camera surveillance system like the one they designed and installed for North Jersey, and that Computer Network Solutions used unlicensed electricians on the project. Zwirn claimed the outside wiring for the cameras was improperly performed and that instead of installing what they represented would be provided, Computer Network Solutions and IC System installed lower cost or substandard cameras and equipment. He also concluded that the cameras intended for the press room were never installed as the room was not even wired for cameras.

LibertyNet

Phil Nolan testified at deposition that Van Lenten approached him about purchasing document management software called LibertyNet, for North Jersey. IC System was a designated reseller of the software and the LibertyNet logo was on IC System's stationery. LibertyNet was proposed for use in North Jersey's human resources department. After trying the software,

however, the human resources department rejected it and had it removed from its computers. Van Lenten bought the software from IC System after its rejection at a cost of $84,800. North Jersey also contends that documents produced by IC System show that it paid LibertyNet only $12,383 for the same software it sold to North Jersey for $84,800.

North Jersey never issued a written purchase order for the LibertyNet software. Instead, Nolan testified that Van Lenten gave him "a verbal purchase order." North Jersey contends Van Lenten circumvented North Jersey policy that no invoice be paid for new products without a written purchase order, and further deceived the company by having Nolan disguise the purchase by sending five monthly invoices, each for $16,960, for "LibertyNet Maintenance HR Project."

Rechtman, North Jersey's fraud examiner, opined that spreading the payment over several months and mischaracterizing the purchase as "maintenance," "indicate that Van Lenten was intentionally attempting to conceal the purchase of the software." He claimed that use of such an "expense smoothing technique," by which "colluding parties . . . conceal the magnitude of the billing for budgetary supervisory oversight" is "common in purchasing fraud schemes."

Cuervo, a former North Jersey employee who was working for Computer Network Solutions at the time the suit was pending in the trial court, testified at deposition that he executed the LibertyNet licensing agreement on behalf of North Jersey three months after the human resources department rejected the software. Although aware that the agreement required review by the legal department, Cuervo testified he signed the documents without such review at Van Lenten's direction. Although North Jersey claimed the LibertyNet software was never used by anyone at North Jersey, Cuervo claimed he worked with North Jersey's Weekly Division to try and implement it there. Notwithstanding the human resources department's rejection of the software and North Jersey's claim it was never used elsewhere in the company, Van Lenten authorized annual payments to IC System for "maintenance" of the software for three years at a cost of $34,000.

Payment Card Scanning

Nolan testified at deposition that Van Lenten contacted him to inquire as to whether IC System could perform payment card scans for North Jersey to detect weaknesses in the company's network that might expose the credit card information of its subscribers to hackers. Nolan was not familiar with the technology but his partner Cook advised that Computer Network

Solutions could perform them. Computer Network Solutions, however, had never before performed such scans and has only ever performed them for North Jersey. North Jersey claims the reason for that is "that it is completely unnecessary to hire an outside vendor to perform the scans if the company has its own IT department, as [North Jersey] does."

Cuervo acknowledged at deposition that it might be possible for "a low-level clerk [to] actually do the scans" today, but North Jersey could not perform the scans itself in 2007, when Van Lenten first inquired about the service, because Qualys, the software provider, "would not work with [North Jersey] directly" because it was "going strictly through [its] reseller market." North Jersey, however, produced evidence that it purchased the Qualys software for the scans in 2007 directly from Qualys for $2,145, and that Computer Network Solutions charged North Jersey $10,543 to run the scans that year.

Bryan Shaughnessy, North Jersey's network analyst, averred that he could have run the scans for North Jersey in 2007 as he did for the company in 2008, for a fraction of the cost charged by Computer Network Solutions and IC System. Shaughnessy also claimed that while Computer Network Solutions performed the scans for North Jersey in 2007, he was unaware "of any [payment card] scanning performed by [IC System] — who billed [North

Jersey] for this service — in 2008." Shaughnessy claimed that by 2008, he "was in charge of any running [of] the [payment card] scanning and . . . did so without any assistance from [Computer Network Solutions] or [IC System]." IC System claims it ran or directed the scans for North Jersey in 2008, for which it received payment authorized by Van Lenten for $8715.15.

Network Security and Monitoring

IC System billed North Jersey approximately $75,000 per year between 2005 and 2008 to monitor its network and detect security intrusions. Computer Network Solutions installed two "Intruder Detector Systems" machines, which Cook claimed cost between $15,000 to $20,000 each. Notwithstanding that the purchase of the machines was a one-time cost passed along to North Jersey in the first year of the project, Cook admitted at deposition that IC System continued to charge North Jersey $70,000 each year thereafter.

Shaughnessy claimed the system, which was supposed to provide notification to North Jersey whenever its network and servers were experiencing problems, "never worked." He averred "recall[ing] several instances when [North Jersey's] servers went down and the monitoring service did not know about it." Shaughnessy believed that both Computer Network Solutions and Van Lenten had largely abandoned the project shortly after its

installation and that Computer Network Solutions "was simply billing [North Jersey] for nothing." He also certified that the "System Administration and Network Monitoring" service for which IC System charged North Jersey $5000 per month between November 2003 and May 2007 was simply "another ineffective service provided by [Computer Network Solutions]."

Shaughnessy further claimed the "Extended Network Services with On-Demand Spares" for which North Jersey paid Computer Network Solutions and IC System approximately $31,500 in 2007 and $44,000 annually in 2008 and 2009, as authorized by Van Lenten did not even exist. Specifically, Shaughnessy certified that the "service literally could not have been in existence without [him] knowing about it," and he was thus "certain [North Jersey] was not using this service and [IC System] and [Computer Network Solutions] were providing nothing to [North Jersey] in return for the $44,000 annual payment."

Nolan acknowledged the service was "kind of a unique opportunity that [North Jersey] came to [him] with, what is considered emergency service over and above what a standard maintenance contract would be" and not offered to other customers. He agreed that the service "was being used without [Shaughnessy] knowing it," but claimed that was because Van Lenten had lost confidence in Shaughnessy's ability to restore

14                                           A-2898-14T1

the network in the event of an emergency. Nolan admitted he kept no written list of the "spares" IC System maintained for North Jersey and was not aware of whether any "spares" were used or whether IC System or Computer Network Solutions actually performed any emergency maintenance or repairs to North Jersey's network during the period the company billed North Jersey for the service. Cook likewise testified at deposition that he did not have a list of the "spares" Computer Network Solutions maintained for North Jersey pursuant to this contract and could not identify any emergency maintenance or repairs to North Jersey's network during the period the company billed North Jersey for the service.

Having reviewed the depositions of Nolan, Cook and Cuervo, Rechtman, North Jersey's fraud expert, opined that none could clarify or describe the nature of these different monitoring services, and that Computer Network Solutions and IC System's failure to produce any evidence of "on-going exception reports or notices of downed servers between the years 2007 and 2009" suggests that although the "Intruder Detector" devices were installed, they were not "deployed or used in a meaningful way." Rechtman concluded that the network monitoring Computer Network Solutions and IC System claim to have done is not supported by the evidence, and that Van Lenten should have been aware that he

was overpaying for services not being provided by Computer Network Solutions and IC System and not utilized by North Jersey.

## Evidence of Motive or Intent to Collude

Although acknowledging it was not successful within the discovery the trial court allowed in demonstrating any direct benefit to Van Lenten from the many improvident payments he authorized to Computer Network Solutions and IC System,[5] North Jersey claims it produced direct evidence of the collusive scheme in the form of email exchanged between Van Lenten and Nolan. North Jersey points in particular to exchanges between the two in connection with a $2,000,000 upgrade to North

---

[5] While the judge was especially critical on that point, North Jersey points out that the judge denied its motion to compel discovery of IC System and the Nolans, stating "[t]he current request is unreasonable given the time constraints of the discovery end date [sixty days remained]. Extensive discovery has been provided as the Defendant is aware of its discovery obligations and failure to produce may result in preclusion at the time of trial." The judge denied plaintiff's motion for reconsideration but extended discovery for four months. Given that the extension provided the parties six more months of discovery, the judge's reason for denying the request in the first instance, the nearness of the discovery end date, no longer had any vitality. Failure to consider the motion on its merits was thus a mistaken exercise in discretion. See State in Interest of A.B., 219 N.J. 542, 554 (2014). Accordingly, plaintiff's motion to compel discovery from IC System and the Nolans should be considered on its merits on remand.

16                                           A-2898-14T1

Jersey's entire computer system IC System proposed to North Jersey in September 2008.

Following Van Lenten's review of the first of three proposals IC System prepared for the upgrade, he sent the following email to Nolan with a copy to Cook:

> Hope your [sic] having fun getting sunburn on the top of your head.  Now that we're going to move forward I'm digging into some of the details in the proposals.  I just reviewed the desktop piece and have some concerns, I've highlighted them in red. Next week when you have some time let's get Montoya on the phone and go over the issues for clarity or reconciliation so we're all on the same page.  I'll send the other 2 stages when I'm done going through them. Have fun, don't drink too much.

Twenty-two minutes later, Van Lenten sent a second email to Nolan, this time with no copy to Cook:

> Need to clean up the typo's [sic] and misspellings as well as adjust the numbers. This can't be sloppy.  This is not a criticism, the Finance guys don't know what they're doing so it's the only thing they can focus on to bust balls.

Nineteen minutes later, Van Lenten sent yet a third email, again, only to Nolan:

> Probably 100K in more room.  Please strip my comments about money from the documents before sharing with Tom.  Also need to talk about transfer of knowledge, licensing and maintenance.

After this exchange, Nolan sent revised proposals to Van Lenten, which contained approximately $150,000 in increased costs. North Jersey contends these emails "demonstrate that Van Lenten was not an IT executive interested in protecting his employer and obtaining the best possible prices" but was instead colluding with Nolan and Cook to swindle North Jersey.

North Jersey contends that any doubt as to whose interests Van Lenten was promoting are put to rest by another exchange between Cook and Van Lenten several weeks later. On December 3, 2008, Cook sent Van Lenten an email with an attached PowerPoint entitled "Business Impact of Infrastructure," along with a note, saying: "[I] [j]ust did this for another client. Would something like this be helpful to you?" Van Lenten replied:

> Good stuff, if they had the attention span
> of more than 5 seconds it would work but
> I'll try. Hoping for the best, meeting with
> the family on Tuesday to pitch it.
> Hopefully great holiday for all.

The trial judge assessed these proofs and the other evidence adduced on the motions and concluded that North Jersey's lawsuit was "clearly a classic example of 'buyer's remorse,'" premised on the "baseless conclusions" of its "self-proclaimed expert." He found "[t]he record [is] devoid" of any complaints by North Jersey over the several years that the parties did business that defendants overcharged or failed to

provide the equipment or services sold, and characterized "the instant litigation" as "then based on an inference upon another unrelated inference." We highlight a few of the findings.

The judge dismissed the evidence that Van Lenten had not negotiated the prices for the equipment and services it purchased from defendants or sought competitive proposals from other vendors, finding there was "no evidence that Van Lenten was required to do so as Vice President of IT" and concluded that North Jersey "cannot recover" for its "own improvident conduct." The judge was critical of the certification of North Jersey's long-serving facility manager Frank Devetori, in which Devetori asserted that North Jersey did not get all the cameras it paid for, stating "[t]he mere assertion by a witness that he now cannot find something sold years earlier is insufficient as a basis for an assertion that it was not tendered." The judge dismissed what Devetori characterized as Van Lenten's highly unusual act of having all the camera work done on nights and weekends, which Devetori surmised as having been done to preclude him from any involvement, as a "net suspicion, not within the personal knowledge of the affiant."

The judge also concluded he need not consider the proofs offered by Jeffrey Zwirn, the expert North Jersey retained to testify on the design and installation of electronic security

19                                                    A-2898-14T1

and video surveillance systems.  Although acknowledging that
Zwirn was "qualified to opine on the characteristics of security
systems, and the appropriateness of Defendants' actions in
regard thereto," the judge found Zwirn's opinion "as regards the
issue of fraud" a net opinion and thus dismissed his entire
opinion as inadmissible.  The judge thus failed to consider
Zwirn's opinion that neither Computer Network Solutions nor IC
System had the necessary New Jersey licenses to design and
install the sort of closed circuit camera monitoring system they
provided to North Jersey,[6] that defendants could not have
installed the cameras they promised for the press room, as it
was not even wired for cameras, that the outdoor wiring was
improperly installed and that defendants had used unlicensed
electricians to perform the work, as bearing on North Jersey's
claims of fraud, consumer fraud, unjust enrichment and civil
conspiracy.

---

[6] The judge found the installation of the cameras "was performed
under the direct control and supervision of [North Jersey's] IT
director who merely used co-defendants to assist in the project"
and concluded that "[t]he mere assisting in the installation of
security cameras by or at the direction of [North Jersey's] IT
director did not require a license and is not an unlawful
practice under the NJCFA [New Jersey Consumer Fraud Act]."  The
judge's factual conclusion of defendants' role in the security
camera upgrade appears at odds with Cook's deposition testimony,
included in the motion record, that "[t]he role of [his]
organization was to supply the cameras, the engineering, the
design, and the installation."

The judge similarly dismissed the expert opinion of North Jersey's certified public accountant and certified fraud examiner Yigal Rechtman. Although finding that Rechtman is "arguably qualified to offer an opinion as to fraud and fraudulent billing," the judge dismissed his opinions as to Van Lenten's frequent overrides of management controls in purchasing equipment and services from Computer Network Solutions and IC System and those entities unusually high profits from their sales to North Jersey as "conjecture" and not providing sufficient information as to how he reached his conclusions.

The judge specifically dismissed Rechtman's conclusions that Computer Network Solutions and IC System's "unreasonable profits in the range of 200% to 415%," which were "four times as high as [Computer Network Solutions] own gross profit margin, of about 50%" and well exceeding the 35% for the industry based on the NAICS [North American Industry Classification System] code for "computer and computer peripheral equipment and software merchant wholesalers," as "speculative," and concluded that fraud "is simply not a legitimate inference to be drawn from the mere existence of a large profit."

The judge concluded

> The undisputed evidence, viewed in the light
> most favorable to [North Jersey], only
> demonstrates that the Defendant vendors were

21

comfortable and friendly with Van Lenten; that [North Jersey] paid large sums of money for services that, in retrospect, it wishes it had not, and which may not have been needed; that the Defendants obtained very high profits from [North Jersey] in their business transactions; and that, in hindsight, Van Lenten's purchasing decisions were impecunious.

The judge found "[t]he only matter in dispute was the unfounded conjecture that Defendants engaged in a fraudulent scheme." He concluded that "[t]here is no provision in the laws of New Jersey that allows for an argument that Defendants [Computer Network Solutions and IC System] took advantage of [North Jersey] by getting <u>too good of a deal</u> when they negotiated at arms' length with the Plaintiff."

In our view, the last sentence highlights the problem here. The judge assumed in deciding the motion that the transactions between North Jersey and IC System were "negotiated at arms' length," when the premise of North Jersey's case was that the relationship between Van Lenten and Nolan and his companies was not an arms' length one. Because the court assumed the transactions plaintiff complained of were legitimate, it did not view the competent evidence in the light most favorable to North Jersey, the non-moving party, nor accord it the legitimate inferences to be drawn from those facts. <u>R.</u> 4:46-2(c). Doing so mandates reversal of the motions.

We, of course, review summary judgment using the same standard that governs the trial court. Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012). Thus, we consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill supra, 142 N.J. at 540. Applying that standard here, we conclude summary judgment was inappropriate on North Jersey's claims of fraud, consumer fraud, unjust enrichment and civil conspiracy.

We turn first to the trial judge's decision striking plaintiff's expert reports as net opinions. See Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 384-85 (2010) (noting a court confronted with an evidentiary question on summary judgment must resolve that question before ruling on summary judgment and appellate review follows in the same sequence). As previously noted, the trial court found both experts qualified to provide expert testimony in the case, although noting Rechtman as only "arguably" so. We agree that both experts were qualified to offer opinions in this matter, Zwirn on electronic security and video surveillance systems and Rechtman as a CPA and Certified Fraud Examiner. See Agha v.

23

Feiner, 198 N.J. 50, 62 (2009) (noting an expert "must 'be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion'" (quoting State v. Moore, 122 N.J. 420, 458-59 (1991))).

We reject, however, the trial court's conclusion that the expert reports were net opinions. Zwirn's opinions that defendants were not qualified or licensed to install the surveillance camera system; the system was not installed correctly and the equipment provided was substandard or not as represented; maintenance and spare parts for new cameras under manufacturer's warranty were not consistent with industry practice; the pricing grossly exceeded industry standards and defendants' own established gross profit margins; and the press room was not wired for cameras were not "'based merely on unfounded speculation and unquantified possibilities,'" Townsend v. Pierre, 221 N.J. 36, 55 (2015) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997), certif. denied, 154 N.J. 607 (1998)), but on facts in the record, his personal observations and the type of information commonly relied on by experts forming opinions on the same subject, see N.J.R.E. 703; Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008).

24                                                                              A-2898-14T1

We reach a similar conclusion with regard to Rechtman's report. His opinions that Van Lenten had not followed internal management controls in approving purchases from Computer Network Solutions and IC System; agreed to purchase products that were not needed, and in at least one instance, the company had rejected; failed to obtain the best prices for goods and services; failed to ensure Computer Network Solutions and IC System were capable of handling projects assigned to them and purchased goods and services from defendants at grossly inflated rates, are all grounded in the facts and explained in his report. To the extent the court believed that particular conclusions of either expert were not justified, it was free to conduct a N.J.R.E. 104 hearing, and might have been advised to do so before rejecting wholesale the reports of qualified experts, who defendants had elected not to depose. See Kemp v. State, 174 N.J. 412, 426-27 (2002).

Having considered the reports of plaintiff's experts and reviewed the voluminous record on summary judgment, we are convinced that the competent proofs on the motion, viewed in the light most favorable to plaintiff and according it all reasonable inferences, establish that plaintiff put forth sufficient proofs on its claims of fraud, consumer fraud, unjust enrichment and civil conspiracy to have survived summary

25

judgment.[7]  See In re Estate of DeFrank, 433 N.J. Super. 258, 266 (App. Div. 2013) ("'[T]he cases are legion that caution against the use of summary judgment to decide a case that turns on the intent and credibility of the parties.'") (quoting McBarron v. Kipling Woods, L.L.C., 365 N.J. Super. 114, 117 (App. Div. 2004)).  We do not suggest that a jury will find, at this late date, that Van Lenten colluded with defendants to bilk North Jersey out of millions of dollars in the course of providing it IT equipment and services.  It may well conclude, as the trial judge did, that plaintiff failed to have adequate controls over its purchasing in place and the case is only one of "buyer's remorse."  But it is for the jury, and not the trial judge, to determine what evidence is credible, what inferences should be drawn and whether defendants breached any duty owing to plaintiff resulting in damages.  See Scully v. Fitzgerald, 179 N.J. 114, 130 (2004).

Because it is not the judge's function on summary judgment to weigh the evidence and determine the truth of the conflicting claims but only to identify the existence of such genuine disputes, Brill, supra, 142 N.J. at 540, we reverse the grant of

---

[7] In the course of the panel's questions to plaintiff's counsel at oral argument regarding the basis for its conversion claim, counsel conceded summary judgment on that claim was appropriate. We agree and affirm the trial court's order in that respect.

summary judgment and remand the case for trial.  North Jersey's discovery motion is to be considered on the merits as is its motion to amend its complaint to add an additional party.  We do not retain jurisdiction.  Because the judge who heard the matter has already weighed the evidence and expressed his views of the credibility of plaintiff's experts, the matter should be reassigned to another judge on remand.  See In re Guardianship of R.G. and F., 155 N.J. Super. 186, 195 (App. Div. 1977).

Affirmed in part; reversed in part and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION