**RECORD IMPOUNDED**

> **NOT FOR PUBLICATION WITHOUT THE**
> **APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court."
> Although it is posted on the internet, this opinion is binding only on the
> parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0619-17T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

E.S.,

    Defendant-Appellant.

———————————————————————

IN THE MATTER OF THE GUARDIANSHIP
OF M.C.,

    a Minor.

———————————————————————

        Submitted May 7, 2018 — Decided June 7, 2018

        Before Judges Accurso, O'Connor and Vernoia.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Monmouth
        County, Docket No. FG-13-0086-16.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Steven Edward Miklosey,
        Designated Counsel, on the brief).

        Gurbir S. Grewal, Attorney General, attorney
        for respondent (Melissa H. Raksa, Assistant
        Attorney General, of counsel; Joshua Bohn,
        Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (M. Alexis Pollack, Deputy Public Defender, on the brief).

PER CURIAM

Defendant E.S. appeals from a final judgment terminating her parental rights to her second child, Meg,[1] now three years old. She contends the Division of Child Protection and Permanency failed to prove prongs three and four of the best interests standard of N.J.S.A. 30:4C-15.1(a)(3)-(4) by clear and convincing evidence. The Law Guardian joins the Division in urging we affirm the judgment. Having considered defendant's arguments in light of the record and controlling law, we affirm the termination of her parental rights.

The essential facts of this case are as follows. E.S., thirty-six years old, suffers from schizoaffective disorder, bipolar type, continuous. The Division received a report that when E.S. was seven months pregnant with Meg, she was smoking marijuana and drinking beer. The reporter knew of E.S.'s diagnosis and her participation in a mental health program, but relayed E.S. "sometimes . . . does not let people in the home when she is supposed to and sometimes she does not take her

---

[1] This name is fictitious to protect the child's identity. E.S. surrendered her parental rights to her son born in 2000, and he was adopted by relatives.

A-0619-17T3

medication." The referent reported E.S. ate spoiled or rotten food that had been out all week and when the baby kicked, explained she used corporal punishment by poking her own stomach.

Division workers visited E.S. with a representative of Resources for Human Development Coastal Wellness (RHD), the provider supporting E.S. in the community. RHD reported E.S. "work[ed] with a team of staff including a Wellness Coach, Life Skills Specialist, Medical Case Manager, Recovery Support Practitioner and a MICA [mentally ill chemically addicted] specialist." The agency further noted that although E.S. lived independently, she required support from its staff five to seven days a week "to maintain in the community."

E.S. refused to meet with the workers without police being present, explaining she "was taken away [by] these people, my father committed suicide[,] and they ruined my life."[2] After police arrived, E.S. continued to refuse to speak with the Division caseworker, but was amenable to speaking with the representative of RHD. E.S. refused Division services during her pregnancy and the Division had no further contact with her

---

[2]  Although we are unaware of the details, the record makes clear E.S. was raised by persons other than her parents after her mother's parental rights were terminated on application of the Division.

until Meg was born in April 2015, when the hospital called the Division to report its concerns.

The hospital reported that ten days before Meg was born, E.S. had been admitted to its crisis unit with "severe and chronic schizophrenia," and suffering from delusions. E.S. tested positive for marijuana at Meg's birth and the hospital was supervising her contact with the baby out of concern for the infant.

The Division effected an emergency removal two days after the baby was born. It explored placing Meg with E.S.'s mother, but ruled her out because of her record with the Division, stemming from her own history of schizophrenia. Instead, the baby was placed with a non-relative resource family. E.S. was again hospitalized in a crisis unit in May, a few weeks after Meg's birth. Judge Flynn thereafter ordered supervised visitation once a week for one hour but would not permit E.S. to hold the baby until she submitted to a psychological evaluation. E.S. arrived for her first visit with Meg with a hula hoop and bubbles.

When E.S. appeared at Division offices for an initial substance abuse evaluation in June, six weeks after the baby was born, she volunteered that both she and her mother suffered from schizophrenia, and that the CIA had implanted devices in both

A-0619-17T3

their heads at birth. Dr. Brandwein, the Division's psychological expert, interviewed E.S. in July, although he had not been provided with her mental health records, as E.S. had yet to sign a release of those records to the Division. Based on his clinical interview, Dr. Brandwein advised the Division that E.S. could be permitted to hold Meg for ten minutes during her visits.

In August, E.S. was again hospitalized. She reported delusions and required restraints. In September, the Division received E.S.'s treatment records from Ancora, which revealed her eleven hospitalizations between 2009 and 2013, including one for fifteen months in 2012-2013. After reviewing those records and those of E.S.'s hospitalization the prior month, Dr. Brandwein advised that E.S.'s visitation be suspended until she complied with all court-ordered evaluations and recommendations, random urine screens and all RHD recommendations and services, including a five-day-a-week partial care program and enrollment in a parenting education program.

When the matter returned to court later that month, E.S. was in jail on charges of reckless driving and destruction of property, but was transported to the hearing. The court suspended visitation based on Dr. Brandwein's recommendation and ordered E.S. to submit to psychiatric and substance abuse

A-0619-17T3

evaluations and comply with RHD's recommendations for services. E.S. attended five of six scheduled visits in all, missing one only when she was hospitalized.

E.S.'s psychiatric evaluation, which had to be rescheduled five times, was begun, but never completed after a fire alarm interrupted the clinical interview. She never appeared to complete the evaluation. When E.S. finally submitted to a substance evaluation in January 2016, she tested positive for both cocaine and marijuana, resulting in a referral to attend a partial care program at CPC Behavioral Health. Despite the urging of both the Division and RHD, E.S. never attended.

E.S. was admitted to Trenton Psychiatric Hospital in March and was discharged days later. The Division lost track of her two months after that when she stopped responding to any of its communications. The Division later learned E.S. was admitted to Trenton Psychiatric in October 2016, where she remained through the guardianship trial in September 2017.

Dr. Brandwein testified at trial that E.S.'s "schizoaffective disorder is a lifelong condition. It does not get cured and cannot be cured, it doesn't go away. It has to be managed. And even with it being properly managed there are going to be psychiatric hospitalizations." He explained that schizoaffective disorder falls across a spectrum of which E.S.

A-0619-17T3

"is at the severe end." Dr. Brandwein testified he only had records from 2009, although E.S. told him her first hospitalization was almost ten years before that, when she was seventeen. From the records available to him, Dr. Brandwein counted eleven hospitalizations over the prior nine years, "[a]nd we're not talking about in and out of the hospital, 3 or 5 days, get your medication and go. We're talking about months-long hospitalizations."

Regarding his evaluation, Dr. Brandwein testified he believed he "was seeing [E.S.'s] baseline, that is her best." He explained she was not in the hospital and able to participate in the evaluation, but at "that baseline, there was still active psychosis, voices, believing there was a cochlear implant in her body, believing there was bio-micro technology in her body." He described events observed during E.S.'s visits with Meg, asking her to be quiet as E.S. read to her from the Bible, as suggesting E.S. "[was] responding to internal stimuli associated with her psychotic disorder, raising grave concern about her ability to care for a child."

Dr. Brandwein testified that he was not aware of E.S. having lived in the community without extensive mental health supportive services in place, including her own mental health case manager. He was of the opinion that E.S. could not live

independently in the community without that support. When asked whether E.S. could live independently with Meg, Dr. Brandwein responded, "[u]nequivocally no." He testified there were no services the Division could have offered to assist E.S. "in becoming capable of independently parenting." He explained that E.S. "is going to struggle to care for herself in the community. That, even with medication, will never change." He noted that before E.S. was admitted to Trenton Psychiatric, she "was found . . . in her own bed, using her bed as a toilet. This is a grave risk factor to [E.S.], never mind to any child that would be in her care." Dr. Brandwein concluded he "would not, [he] strongly would not recommend placing the child in [E.S.'s] care. Any child, this child. No children."

Dr. Brandwein also testified to the strong bond Meg had developed to the foster parents who had cared for her since she was two weeks old, noting "[f]or all intents and purposes they are her psychological parents." He testified they were meeting all of her needs, and she was thriving in their care. Removing her from them, he opined, would be "highly detrimental" to her psychological functioning. Dr. Brandwein testified he did not conduct a bonding evaluation between E.S. and Meg because "[b]ased upon the fact that there's been no contact for almost [two] years" and Meg "doesn't know who she is," there would be

"an infinitesimal chance" of a bond between the two of them. E.S. did not testify or offer any witnesses.

Judge Bernstein accepted Dr. Brandwein's testimony, which he found credible and clear. The judge found in this "rather sad case" that because of E.S.'s "long, long history of severe mental illness," including "psychosis and the delusions, hallucinations, [and] voices," that she has never been able to care for Meg. Specifically, the judge concluded E.S. "is basically incapable of caring for herself, let alone a small baby with the needs of a small child."

As to the third prong of the best interests test, the judge stated he, "unfortunately" did not think "there is such a thing as any reasonable efforts that would lead to . . . reunification" in this case. The judge found the Division assessed relatives and "attempted to get [E.S.] into drug treatment. She has continued to have mental health management throughout the case and there really wasn't a lot the Division could do, nor did the evaluation indicate that there was any particular treatment that the Division could recommend that would lead to any type of a reunification."

The judge noted "the Division followed up with the mental health management and psychiatrist, got records, and kept up with the status of her treatment. But there really wasn't

anything special the Division could do separately other than the treatment that she was already undergoing at the time." Judge Bernstein found "under the circumstances, . . . the Division has made more than reasonable efforts with regard to this particular case when, in fact, there really isn't any reasonable efforts." He concluded "[t]here really wasn't anything the Division could do in this particular case that would change the situation."

Noting Meg has not seen her mother in over two years, "[a]nd really, the mother at this point is a stranger to the child," the judge found a bonding evaluation between the two "doesn't really make any sense." Acknowledging the testimony that Meg is bonded to her foster parents, who wish to adopt her, and is apparently thriving under their care, the judge found Dr. Brandwein's opinion that termination would not do more harm than good, "clearly logical, expected under the circumstances since this is the only home that this child knows." Having reviewed the evidence and heard the testimony of the caseworker and Dr. Brandwein, Judge Bernstein was satisfied the Division carried its burden on all four prongs by clear and convincing evidence.

E.S. appeals, arguing "the Division relied on Dr. Brandwein's psychological evaluation to provide [her] with nothing." "Armed with Dr. Brandwein's opinion that [her] cause for reunification was essentially hopeless, the Division

willfully decided to leave everything to [RHD], spare for psychiatric evaluations and substance abuse evaluations." She contends "[t]he Division failed to satisfy the third prong by refusing to make a serious effort to locate and provide services to assist [her] in independently parenting her daughter." She argues the Division failed to prove termination would not do more harm than good because it prevented her "from enjoying sustained therapeutic visitation with her daughter, and thereafter used the lack of a bond to deny her a bonding evaluation." We reject those arguments because they ignore the evidence in the record regarding the risk E.S. posed to Meg.

The third prong of the best interests standard requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances" that necessitated removal and placement of the child in foster care. N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts" consist of services "to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure . . . ." N.J.S.A. 30:4C-15.1(c). The reasonableness of the efforts, of course, depends on the facts and circumstances of each case. In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999).

Provision of services under the third prong "contemplates efforts that focus on reunification," In re Guardianship of K.H.O., 161 N.J. 337, 354 (1999), and "may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation," N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007). The services provided to meet the child's need for permanency and the parent's right to reunification must be "'coordinated'" and must have a "'realistic potential'" to succeed. N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002) (quoting N.J.A.C. 10:133-1.3).

The reasonableness of the Division's efforts, however, "is not measured by their success," D.M.H., 161 N.J. at 393, and "[t]he failure or lack of success of such efforts does not foreclose a finding that the Division met its statutory burden to try to reunify the children with the family." N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007). Moreover, "[e]ven if the Division ha[s] been deficient in the services offered to" a parent, reversal of the guardianship judgment will not necessarily be "warranted,

because the best interests of the child controls" a court's determination as to termination of parental rights. Id. at 621.

E.S.'s arguments ignore the evidence before the trial court that she presented a severe and substantial risk of harm to Meg by reason of her longstanding and intractable schizoaffective disorder. See N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 435 (App. Div. 2001). In the Division's view, that risk was so great it petitioned the court to prevent E.S. from holding her daughter during their supervised one-hour visits. And although Dr. Brandwein initially advocated to permit E.S. such contact, he changed his position upon being provided with almost nine years of her most recent psychiatric records and instead counselled that visitation be immediately suspended.

Dr. Brandwein explained exactly why he found E.S.'s condition, a condition in which she responded to internal stimuli, hearing voices and experiencing other delusions even when maintained on psychotropic medications, posed such an extreme risk to herself as well as any child in her care. He also detailed the extensive services RHD employed to maintain E.S. in the community and her regularly recurrent hospitalizations notwithstanding those services. He described her mental illness as "severe" and opined that there were no

13

services the Division could provide to make it possible for E.S. to safely parent Meg.

Judge Bernstein heard his testimony and accepted his conclusions. We generally "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)). We do so here. There is nothing in the record to suggest that E.S. could safely parent Meg now or in the foreseeable future. E.S. offers nothing to suggest the situation would change with specific services. She suffers from a mental disorder that prevents her from being safely able to parent her daughter, and there is no evidence to demonstrate that circumstance, which had persisted for much if not all of E.S.'s adult life, was amendable to change. See In re Guardianship of R. G. and F., 155 N.J. Super. 186, 194-95 (App. Div. 1977).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14

A-0619-17T3