# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2015-17T1
                         A-2016-17T1

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

L.O. and O.M.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.R.M.,
a Minor.

_____

        Submitted October 3, 2018 – Decided October 31, 2018

        Before Judges Fuentes, Vernoia and Moynihan.

        On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0146-17.

Joseph E. Krakora, Public Defender, attorney for appellant L.O. (Louis W. Skinner, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant O.M. (Howard P. Danzig, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Mohamed Barry, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Olivia Belfatto Crisp, Assistant Deputy Public Defender, on the brief).

PER CURIAM

L.O. (Lola) and O.M. (Omar), the parents of L.R.M. (Luna) born November 10, 2015, separately appeal from a judgment of guardianship entered after a four-day trial terminating both parents' parental rights and awarding guardianship to the New Jersey Division of Child Protection and Permanency (the Division).[1] In these consolidated appeals, each defendant claims that the judge's conclusions were not supported by clear and convincing evidence. We have discretely considered Lola and Omar's arguments and determine the judge's

---

[1] We utilize pseudonyms for the parties and the child to protect their privacy, preserve the confidentiality of these proceedings, and for the reader's convenience. R. 1:38-3(e).

conclusions were well-supported by competent evidence. Consequently, we affirm.

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Moreover, we accord even greater deference to the judge's fact-finding "[b]ecause of the family courts' special jurisdiction and expertise in family matters." Id. at 413. We will not disturb the trial judge's factual findings unless they are "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007).

The Legislature has declared, as a matter of public policy, "[t]hat the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare . . . ." N.J.S.A. 30:4C-1(a). Parental rights, however, are not inviolable. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). "The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the

child standard." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). Before

parental rights may be terminated, the Division must prove the following four

prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also A.W., 103 N.J. at 604-11.]

The standards "are not discrete and separate; they relate to and overlap with one

another to provide a comprehensive standard that identifies a child's best

interests." K.H.O., 161 N.J. at 348.

The trial judge understood the import of her decision to terminate the defendants' fundamental and highly protected parental rights, as evidenced in her thirty-one page written opinion. See Santosky v. Kramer, 455 U.S. 745, 753-54 (1982) (noting natural parents have a fundamental right in the care, custody and management of their child and termination of that right is subject to due process protections); K.H.O., 161 N.J. at 346-47. The judge heeded the mandate of the Court in conducting a fact sensitive analysis of the four statutory factors, specific to each defendant. K.H.O., 161 N.J. at 348.

It is common that the proofs relating to the first and second prongs dovetail. N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). As the trial judge observed, that is especially so in this case and we jointly analyze those prongs.

Both parents argue neither of them caused any harm to Luna because the child was never in their care. The Division placed Luna with a resource parent after a referral on the day she was born; an emergency removal followed three days later. As the trial judge correctly noted, "[t]his is not a typical [g]uardianship case where the child has suffered actual harm at the hands of her parents. This is not a case where there is evidence that the parent would intentionally harm the child."

5

But the absence of actual harm to the child is legally inconsequential here. We have previously determined, "[t]he absence of physical abuse or neglect is not conclusive on the issue of custody."  In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977).  Because "the psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood," Sees v. Baber, 74 N.J. 201, 222 (1977), courts must consider even "the potential for serious psychological damage to the child inferential from the proofs," Guardianship of R., 155 N.J. Super. at 194 (quoting Sorentino v. Family Children's Soc'y, 72 N.J. 127, 131-32 (1976)).

The proofs considered by the trial judge included the uncontroverted testimony of the Division's witnesses: Dr. Alison Strasser Winston, a psychologist who thrice evaluated each defendant, and Dr. Larry Dumont, who conducted three psychiatric evaluations on Lola and two on Omar.  The judge's finding that Lola's pronounced "cognitive deficits . . . prevent her from being a feasible parent for her daughter either independently or as a secondary-parent with [Omar] who has [a severe] untreated psychiatric illness" is well-supported by the evidence.

A-2015-17T1

The judge found that Dr. Winston "was unable to administer any psychological testing measures" to Lola because her "significant cognitive delays" rendered her "unable to read" or to "understand the questions" the doctor posed. The judge credited Dr. Winston's opinion that Lola, who the doctor diagnosed with Unspecified Intellectual Disability, would be unable to learn parenting skills and progress through the services offered by the Division due to her "cognitive delays and limitations," which "would impair her from safely parenting a child." Lola's claim that the judge did not consider her substantial compliance with and advancement in the Division-provided services is not supported by the record. The judge twice noted that she complied with services except substance abuse treatment[2] and the Division's referral to the Division of Developmental Disabilities. The judge concluded, "[b]ased upon the Division's experts and testimony of the caseworker . . . the Division has proven by clear and convincing evidence that it is clearly not from a lack of effort by [Lola] that reunification with her daughter is not feasible"; her cognitive limitations made reunification unrealistic. The judge relied on Dr. Winston's opinion that "no amount of additional services will improve [Lola's] cognitive functioning."

---

[2] Lola tested positive for cocaine twice.

Addressing the father's parental fitness, the judge found Omar's "significant mental health issues and anger management difficulties . . . affect his capacity to provide a safe and stable home for his child." She also found Omar refused to acknowledge those issues and the high level of risk they posed to Luna. The record supports those findings.

Dr. Winston twice diagnosed Omar with schizoaffective disorder – bipolar type "characterized by delusions in combination with a mood disorder manic type." After testing revealed Omar: had poor impulse control; presented a high risk he would have unrealistic expectations of a child; and lacked empathy, Dr. Winston opined that Omar "was unable to safely parent a child." His participation in parenting classes did not improve his insight into his mental health issues.

The judge credited Dr. Winston's opinion that "given the significant extent of [Omar's] mental illness, and his minimal, if any, therapeutic progress," he is

> currently incapable of providing his daughter with a safe and stable environment, and the pervasive and chronic nature of his mental health issues, combined with his failure to consistently comply with treatment, strongly suggests that he will be incapable of adequately addressing these concerns within a time frame that would meet his daughter's need for permanency.

8

The judge concluded that Omar's "impulsive behavior and delusional thoughts" would present a "high risk for abuse or neglect" if Luna were reunited with him. The judge's findings of Omar's: delusional thoughts; positive tests for cocaine; non-compliance with substance abuse treatment; and non-compliance with medication buttress her conclusion. In light of this record, we reject Omar's argument that there was insufficient evidence that he was unwilling or unable to eliminate the harm posed to Luna.

The parents' history of domestic violence, supported by Lola's accounts of the volatile nature of her relationship with Omar, were factors properly considered by the judge. Notwithstanding both parents' present arguments that Lola understands what to do in the event Omar commits future acts of domestic violence, the judge found "there was a significant history of domestic violence" between the parents. The judge credited Dr. Winston's opinion that Lola "was incapable of protecting a child and herself from harm from her husband. She appears helpless to extricate herself from that relationship."

In Guardianship of R., 155 N.J. Super. at 194-95, we recognized that parents who suffer from organic conditions may be "morally blameless" and that their parental inadequacy may be engendered by those problems as well as the interaction of the parents' personalities. Nonetheless, we held the proper focus

A-2015-17T1

was on the child's best interests.  Id. at 195.  The Supreme Court cautioned that "the price of focusing on the plight of the parents . . . is that the child is kept in waiting for what the decision-makers view as the ideal or best placement." A.W., 103 N.J. at 601-02.  What most concerned the A.W. Court was the lack of evidence of "any realistic likelihood that the parents would ever be capable of caring for the children."  Id. at 614.  Even when parents are not blameworthy, parental unfitness can be established when their behavior "indicates a further likelihood of harm to the child in the future."  Id. at 615-16.

The judge properly recognized that the first two statutory prongs were met by evidence that Lola's cognitive deficiencies and Omar's mental illness, combined with their volatile relationship, posed a danger to Luna's safety and need for permanency.  The proofs also support the judge's conclusion that, in light of the expert's bonding evaluations, Luna would "suffer serious and enduring harm" if Luna's "strong, secure emotional attachment" with her foster mother – her "psychological parent" who is willing to adopt her – was severed. See N.J. Div. of Youth and Family Services v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996) (quoting In re Guardianship of J.C., 129 N.J. 1, 18 (1992)) (recognizing "harms attributable to a biological parent include the prolonged inattention to a child's needs, which encourages the development of a stronger,

'bonding relationship' to foster parents, 'the severing of which would cause profound harm'"). As our Supreme Court held in K.H.O., 161 N.J. at 348-49, harm may be "shown [by proof that] the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm."

Both parents contend the trial judge erred in dismissing Luna's grandfather, Aaron, and aunt, Violet,[3] as potential caregivers pursuant to N.J.S.A. 30:4C:12.1(a), by improperly relying on Division notices – rule-out letters – sent pursuant to N.J.S.A. 30:4C:12.1(b), that were based on arbitrary and subjective criteria that did not fully explore the family alternatives.[4]

---

[3] We again use pseudonyms in place of the family members' actual names.

[4] N.J.S.A. 30:4C-12.1 provides in part:

> a. In any case in which the Department of Children and Families accepts a child in its care or custody, including placement, the department shall initiate a search for relatives who may be willing and able to provide the care and support required by the child. The search shall be initiated within 30 days of the department's acceptance of the child in its care or custody. The search will be completed when all sources contacted have either responded to the inquiry or failed to respond within 45 days. The department shall complete an assessment of each interested relative's ability to

Aaron's rule-out letter was sent in October 2016, over six months following his psychological evaluation. Violet's letter was sent in June 2017 after she indicated she was not interested in caring for Luna. Although the rule-out letters sent to Aaron and Violet advised them both of the review process, and despite the parties' averment that Aaron requested a review that resulted in a second psychological evaluation that was performed on November 27, 2017 during the guardianship trial, there is no record of a review-request. Nor is there any record that Violet expressed her desire to be reconsidered until after the trial

provide the care and support, including placement, required by the child.

b. If the department determines that the relative is unwilling or unable to assume the care of the child, the department shall not be required to re-evaluate the relative. The department shall inform the relative in writing of:

(1) the reasons for the department's determination;

(2) the responsibility of the relative to inform the department if there is a change in the circumstances upon which the determination was made;

(3) the possibility that termination of parental rights may occur if the child remains in resource family care for more than six months; and

(4) the right to seek review by the department of such determination.

A-2015-17T1

commenced. The trial judge found that none of the ten individuals reviewed by the Division as potential caregivers, including Aaron and Violet, sought a reassessment of the rule-out decisions.

The second evaluation concluded only that Aaron "was qualified for consideration as primary caregiver for [Luna]." Contrary to the parents' assertions, the judge did not rely on the rule-out letters. She pointed to the lack of evidence that placement with the alternative caregivers were in Luna's best interests. The judge observed neither Aaron nor Violet "had a bonding evaluation with the child." Neither the parents nor the potential alternative caregivers presented any expert testimony regarding their ability to provide care and support or that it would be in Luna's best interests if one of the relatives were awarded care and custody. Moreover, in that context, the judge concluded "the expert testimony is uncontroverted that if the child were removed from her foster parent she would endure serious and enduring harm."

In New Jersey Division of Youth and Family Services v. J.S., 433 N.J. Super. 69, 75 (App. Div. 2013), we held that "the Division's rule-out authority is always subject to the Family Part's ultimate assessment of that child's best interests." Because "[t]he satisfaction of the rule-out criteria in N.J.S.A. 30:4C-12.1 is, in essence, just one element of the requirements imposed by N.J.S.A.

30:4C-15.1(a)'s four-prong 'best interests' test," id. at 85, the court did not err in ruling that the family members did not present viable alternatives to parental termination.

We reject Omar's contention that the Division "failed to provide the required services to make a reasonable effort at reunification" of father and daughter for the reasons set forth in the trial judge's thorough review of the Division's efforts in this respect.

The parents' arguments that the trial judge did not properly consider kinship legal guardianship (KLG) as a valid alternative to termination of parental rights lack sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(1)(E). Luna's foster mother is willing to adopt her. See N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 509, 513 (2004) (quoting N.J.S.A. 3B:12A-6(d)(3)) (observing "a kinship legal guardian may only be appointed when 'adoption of the child is neither feasible nor likely'" and that "when the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights").

Finally, we are unpersuaded by both parents' challenges to the trial judge's finding that termination of their rights would not do more harm than good. The judge did not simply choose the foster parent over Lola and Omar. She

considered the uncontroverted expert testimony, including the bonding evaluations of Luna with Lola and her foster mother – Omar failed to attend his bonding evaluation – and recognized that even when a parent exposes a child to harm which the parent has been unable to remediate, and the child has bonded with a foster parent, courts are cautioned against termination. We discern no factual or legal basis to disturb the Family Part's decision to terminate defendants' parental rights.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION