# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0035-18T3
            A-1265-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.M. and E.C.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF D.C.,

     a Minor.

_____

        Argued October 7, 2019 – Decided October 25, 2019

        Before Judges Fasciale and Rothstadt.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0046-17.

Ryan Thomas Clark, Designated Counsel, argued the cause for appellant T.M. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Ryan Thomas Clark, on the briefs).

Ruth Ann Harrigan, Designated Counsel, argued the cause for appellant E.C. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Ruth Ann Harrigan, on the briefs).

Sara M. Gregory, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Donna Sue Arons, Assistant Attorney General, of counsel; Julie Beth Colonna, Deputy Attorney General, on the brief).

Cory Hadley Cassar, Designated Counsel, argued the cause for minor D.C. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Cory Hadley Cassar, on the brief).

PER CURIAM

In these consolidated appeals, defendants T.M.[1] (Terry) and E.C. (Eric) appeal from the Family Part's August 20, 2018 guardianship judgment that terminated their parental rights to their now three-year-old son D.C. (David). They also challenge a December 7, 2018 order that changed the child's

---

[1] To protect privacy interests and for ease of reading, we use initials and pseudonyms. R. 1:38-3(d)(12).

placement from what was to be a relative's custody to the child's resource family, after the relative testified she no longer wanted to care for David.

On appeal, defendants assert numerous arguments that essentially contend plaintiff, New Jersey Division of Child Protection and Permanency (Division), failed to prove all four prongs of the best interests of the child test under N.J.S.A. 30:4C-15.1(a). Moreover, Eric contends the matter should have been dismissed and restored to a Title Nine[2] action because the Division caused the relative to abandon her plan to adopt David. The Division and Law Guardian disagree with defendants' arguments. We reject defendants' contentions and affirm, substantially for the reasons stated by Judge William R. DeLorenzo, Jr. in his August 20, 2018 comprehensive ninety-seven page decision and in his oral decision that he placed on the record on December 7, 2018.

The facts and relevant evidence are detailed in Judge DeLorenzo's written decision. Accordingly, we need only summarize some of the relevant facts.

Defendants are David's biological parents. When he was about eight weeks old, doctors determined that he was a special needs child who needed medical attention because the soft spot on his head closed early, for which he underwent cranial surgery in September 2016. David was later diagnosed with

---

[2] N.J.S.A. 9:1-1 to 25-11.

A-0035-18T3

clubbed feet, adenoids, and ear issues, which were addressed by an adenoidectomy and the insertion of ear tubes in April 2017. Also, the Division's expert determined that David was developmentally delayed.

Prior to David's birth, Terry had a history of substance abuse and mental illness. She had been diagnosed with schizoaffective and pervasive developmental disorders and had difficulty complying with her psychiatric treatment regimens. At that time, Terry was receiving assistance from the New Jersey Division of Developmental Disabilities (DDD).

Eric, who had been convicted of various drug possession and distribution charges, was incarcerated before David's birth and remained incarcerated throughout the litigation. As an adult, Eric had been arrested thirteen times and convicted of six felonies. The sentence he was serving when David was born was Eric's third prison sentence. Although he was initially scheduled to be paroled in 2018, his term was extended to 2020. Prior to his incarceration, he was last employed in 2011 for six months. Eric's last regular employment was in 2002, although he stated he did temporary work between 2002 and 2013.

The Division became involved with Terry before David's birth. On December 1, 2015, the Division received a referral from DDD that Terry was seven months pregnant, homeless, and under review for eligibility of social

services benefits.  A psychiatrist from the DDD advised that Terry was hearing voices telling her to harm her baby.  In response, the Division contacted Terry, who stated she had previously heard voices, which had since stopped, she had been a patient at Greystone Park Psychiatric Hospital (Greystone) for two years, and she had received mental health services until June 2015.  She explained that, after the baby was born, her plan was to live in a shelter, where Eric would join her once he was released from prison.

On the day that David was born in February 2016, the hospital notified the Division about his birth and its concern that Terry was using drugs.  The next day, a Division caseworker met with Terry.  Terry told the caseworker she had been diagnosed with bi-polar schizophrenic disorder, that the baby was doing well, that she was receiving mental health services, and that she was going to begin taking her prescribed medication.  That same day, the caseworker confirmed that Terry was receiving treatment, but she had impulse control issues, had missed the baby's feeding, and that a psychiatrist reported Terry was incapable of parenting a child.  There were also concerns about Terry's ability to provide housing for her child, as her current housing situation was temporary.

Approximately twelve days later, the DDD contacted the Division and advised that Terry was not taking her medication, was not compliant with

treatment, and had a long history of homelessness.  Based on that information, the Division executed a "Dodd removal" of David that same day.[3]  Later that evening, the Division placed David with a resource family.

A few days later, the Division filed a Title Nine action, which a judge converted to a Title Thirty action for services under N.J.S.A. 30:4C-12, after he found the Division properly removed the child from Terry's custody.  The judge also ordered that Terry undergo psychological and parenting evaluations.

During the following weeks, Terry began supervised visits with David.  Also, the Division contacted Terry's aunt and Eric's uncle to explore the possibility of placing David with either of them, but they either could not or would not care for the child.  Later, the Division also investigated Eric's aunt as a placement after Eric provided the caseworker with his aunt's name.  Although the Division considered these individuals, no letters were sent confirming they had been ruled out.

At a hearing held in March 2016, a judge ordered Terry to attend all psychological and psychiatric evaluations, to comply with all services

---

[3]  A "Dodd removal" refers to the emergency removal of a child from the home without a court order, as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

recommended by DDD. In April, Terry was ordered to submit to substance abuse treatment, drug screenings, therapy, and parenting classes. Although Terry submitted to the psychological and substance abuse evaluations, she could not comply with related services, and had difficulty caring for David during her supervised visitations, when she was able to attend scheduled sessions with her son. Terry also continued to test positive for drugs, including cocaine, PCP, and THC.

By December 2016, Terry was acting out in an erratic, violent manner. As a result, she was admitted to a local psychiatric hospital and then transferred to Greystone for treatment. Due to her volatile behavior, her visits with David were suspended until early 2017, by which time she had sufficiently stabilized. At that time, although her supervised visits had resumed, she still could not demonstrate that she could independently care for David, despite the various and numerous services the Division arranged for her. Ultimately, Terry became non-compliant with her medications and continued to use drugs, while remaining homeless and otherwise incapable of even caring for herself independently.

While the Division attempted to help Terry address her issues, it also was in contact with Eric, who was initially located in the local county jail before he was transferred to State prison. A Division caseworker met with Eric at the jail

in April 2016 and advised him that David could not yet visit him there because David was not vaccinated.

In May 2016, Eric was scheduled to undergo a paternity test at the jail but by that time, Eric had been transferred to a State prison. The testing was completed in June 2016 and confirmed Eric was David's father.

Once paternity was established, in July 2016, a judge ordered Eric to undergo a psychological evaluation at his correctional facility in addition to therapy and parenting classes. The judge also directed that Eric should be brought to court to attend future hearings if Eric wanted to participate. Eric chose not to attend until March 2017.

The Division attempted to arrange for visits between Eric and David at the various correctional facilities where Eric was housed. However, those efforts were impeded by David's health issues, including his need for vaccinations and his recovery from his September 2016 cranial surgery. In anticipation of Eric attending a January 31, 2017 permanency hearing, a Division caseworker offered to arrange a visit between David and Eric at the local county jail if Eric attended the hearing. Eric refused to attend.

On March 21, 2017, when Eric chose to attend court for the first time since the first hearing in March 2016, the Division attempted to arrange a supervised

visit at the jail where Eric was being housed. However, before that visit could be arranged, Eric was returned to prison. It was not until the next hearing on April 19, 2017, that the judge arranged for Eric to see David for the first time prior to the hearing. Previously, the judge attempted to make arrangements for Eric to see David at the courthouse during earlier hearings, but Eric refused to attend.

After the hearing in April 2017, the judge ordered supervised visits for Eric once a month at the prison if David was cleared by his doctors. Thereafter, between April 2017 and October 2018 the Division arranged for visitations at the facilities where Eric was incarcerated if they were not cancelled due to legitimate reasons such as the facility's rules, Eric's relocation to a different facility, or the child's health. The visits were all positive and during them, Eric demonstrated affection for his son and an ability to care for his needs.

Eric was able to complete courses in prison on parenting and other life skills. In addition, in December 2016, the Division had Eric evaluated during which Eric described in detail his drug use and criminal conduct. The evaluator recommended that Eric participate in individual psychotherapy to address his antisocial personality traits, poor relationship judgment, and history of lifestyle

instability. The Division also attempted to arrange individualized programs and therapy for Eric but was barred by prison rules.

In addition to arranging Eric's visits, having him evaluated, and trying to provide him with individualized services, the Division investigated David's placement with Eric's relative. At Eric's request, in April 2016, the Division contacted T.C.M., (Thelma) who is Eric's cousin. She expressed her interest in taking custody of David and adopting him once paternity was established. After paternity was no longer an issue, Thelma relocated her family from Georgia to New Jersey in August 2016 in order to make herself available to take care of David. Thelma secured a place to live for her and her children, employment, and cooperated in the Division's investigation of her "presumptive eligibility" as a placement for David.

Although the Division initially arranged visitation between David and Thelma in September 2016, it was also interrupted by David's cranial surgery. Once David was medically cleared, in January 2017, regular successful revisits occurred between David and Thelma, while the Division investigated the possibility of placing David with Thelma. In March 2017, the Division approved Thelma's "presumptive eligibility" packet, but due to issues it found with a pending criminal charge, it required her to go through a regular licensing

process. It was not until December 2017 that Thelma became licensed as a resource parent.

On January 31, 2017, a judge approved the Division's permanency plan to terminate Terry's and Eric's parental rights because of Eric's unavailability given his continued incarceration, and Terry's drug abuse and psychiatric issues. The judge then terminated the pending action and, on March 16, 2017, the Division filed its complaint for guardianship.

In connection with the guardianship action, the Division asked Dr. Robert Kanen to conduct psychological evaluations of the parties and bonding evaluations between David, his parents, the resource parents, and Thelma. On July 10, 2017, Kanen conducted a psychological evaluation of Terry. Intelligence testing and a reading test confirmed that Terry had significant cognitive limitations, which impaired her ability to care for herself, let alone a child. Kanen's findings suggested Terry would not be able to recognize the needs of a child or protect a child from physical and psychological dangers. Without support, she would not be able to independently take care of a child. He diagnosed Terry with schizoaffective disorder, intellectual developmental disorder, PCP use disorder, "history of cocaine and marijuana use disorder," and

A-0035-18T3

a hallucinogen disorder. In concluding, Kanen stated "[r]eturning her child to her care would expose the child to an unnecessary risk of harm."

On July 24, 2017, Kanen also conducted a psychological evaluation of Eric. He found that despite Eric having no cognitive limitations, Eric had a history of poor judgment. Due to Eric's personality issues, his multiple incarcerations, and historical unreliability, Kanen concluded that Eric "would have significant difficulty independently supporting himself and a child" and could not provide David with a reliable permanent placement. He diagnosed Eric with an adjustment disorder with mixed anxiety and depressed mood, and a personality disorder with antisocial and dependent features. According to Kanen, testing demonstrated that Eric was "very dependent on others for support," and "would have significant difficulty independently supporting himself and a child due to longstanding personality problems particularly numerous arrests and incarcerations" reflecting "longstanding personality problems that are very difficult to change."

On March 13, 2017, David and his resource family underwent a bonding evaluation conducted by Kanen. The doctor reported that the resource family was very dedicated to David's well-being and that their flexible schedules allowed them ample time to take him to various doctor appointments. Further,

he concluded David was securely attached to his resource family and that the resource parents were knowledgeable, sensitive, and aware of David's needs. According to Kanen, David would suffer enduring emotional harm if he was removed from the resource family's care.

That same day, Kanen conducted a bonding evaluation between David and Thelma. He concluded that at best, there was an insecure bond between them. He found Thelma lacked insight into the harm David would suffer if he was removed from his resource parents, and that it was unlikely Thelma would be able to mitigate that harm. Even though he found Thelma to be warm and nurturing, Kanen had concerns about her ability to care for David because Thelma already had two other children at home and she worked full-time. David's numerous developmental delays created another burden for Thelma and due to the demands of her life, Kanen opined that caring for David would overwhelm her.

On July 10, 2017, Kanen conducted a bonding evaluation between Terry and David. Due to Terry's long history of mental illness, substance abuse, homelessness, and her intellectual disabilities, Kanen opined she would not be able to provide David with a safe and secure home. In concluding, Kanen stated David had an insecure attachment to her.

13

On July 24, 2017, Kanen conducted a bonding evaluation between Eric and David. Although Eric was warm and nurturing toward his son, he only had contact with David five times due to his incarcerations. Kanen ultimately concluded that David would not suffer serious harm if permanently removed from Eric. According to Kanen, "[g]iven [Eric's] current incarceration, eligible parole date and maximum release date he cannot provide this child with a permanent, safe and secure home for quite some time if at all."

Thereafter, Eric had similar evaluations performed on his behalf by psychologist Dr. Gerard Figurelli. On May 8, 2017, Figurelli conducted a psychological evaluation of Thelma. He opined that Thelma demonstrated her commitment to be a caretaker for David by relocating from Georgia to New Jersey, and that there were no impediments to her ability to provide adequate and safe care to David. He suggested that Thelma be given updates as to David's medical treatment and his condition.

On May 23, 2017, Figurelli conducted a bonding evaluation between David and his resource parents. According to the evaluation, David was in the "process of developing a significant, positive, reciprocal emotional attachment" to his resource family given their close interaction. He stated that if David were removed from the resource parent's care, David would certainly suffer harm, but

14

it would not be severe or enduring because of David's young age. The doctor concluded that David should be moved to Thelma's care because she was a relative, and being placed with her would allow David to avoid "exposure to the more long term enduring impact experienced by individuals who suffer (biological) parental loss."

On July 13, 2017, Figurelli conducted a bonding evaluation between Thelma and David. He concluded David was "developing a positive and reciprocal emotional attachment" with Thelma, characterized by comfortability and lack of fear.

The guardianship trial was held over eight days in 2018 before Judge DeLorenzo. Eric did not appear, but at the beginning of trial, his counsel asked the judge to place David with Thelma. Division caseworker Isabelle Castillo and Kanen testified for the Division. One of the resource parents testified for the Law Guardian. Terry testified on her own behalf, while Eric called Thelma and Figurelli as witnesses.

Kanen testified consistent with his evaluations, and that he disagreed with a conclusion reached by Figurelli in his report about the threshold of time required for an attachment to occur. In addition to testifying about his findings, Figurelli testified that continuing familial contact with Thelma was critical for

15

the child's psychological development. He believed that Thelma could mitigate the harm to David caused by his removal from his resource parents as long as the removal was conducted "sooner rather than later" because any delay of the transition occurring within twenty-four to thirty-six months of birth would make the loss even more harmful.

Castillo testified that the Division intended to place David with the resource family because David had been with them since birth and had become attached to them, based on Kanen's reports. The resource mother testified as to her willingness to have open contact between David and his biological family, should her family be permitted to adopt him.

Thelma testified that she had every intention of taking care of David, provided that Eric was in fact David's father. She stated she moved here from Georgia to ensure that she was awarded custody of David in order to return him to his family and that she was willing to allow continued contact between David's biological parents and his resource parents.

Terry testified that when David was removed, the Division told her it was because of her mental health issues, and her homelessness. However, she stated at that time she was living at the shelter and was also taking her prescribed medication.

On August 20, 2018, Judge DeLorenzo issued his written decision finding that the Division proved by clear and convincing evidence each of the four prongs of the statutory best interests of the child test warranting the termination of Terry's and Eric's parental rights. In his decision, he found all of the witnesses to be credible and he made detailed findings as to each of the four prongs of the best interests test before ordering that the parties' parental rights be terminated.

Addressing whether David should be left with his resource family who wished to adopt him or be transferred to Thelma's custody, the judge concluded it was in David's best interest to be placed with Thelma. The judge found that Thelma clearly demonstrated her commitment to David by relocating her family from Georgia. He observed that the Division did not investigate Thelma's qualifications in a timely manner or diligently arrange for her visits with David. He concluded that it was in David's best interest to be transitioned into Thelma's care over nine weeks. The judge stated that prior to the transfer Thelma was initially to have unsupervised visitation, then overnight visitations, and then weekend visits.

At a hearing on November 15, 2018, the Division informed the judge that Thelma was unresponsive to the Division's efforts to transfer David's custody as ordered. The judge then got Thelma on the phone in open court and she stated

that she made the decision to not accept placement of the child because the Division, which was now her employer, would not help her. According to Thelma, her new full-time job required her to work regular business hours which prevented her from being able to attend to all of David's appointments. She complained that the Division failed to provide her with needed assistance and never informed her that David needed to be brought to physical therapy and other treatments regularly. Thelma also explained that she became overwhelmed by the Division questioning whether she could take care of David and that she and her family were made to feel uncomfortable by Division workers coming to her home and interrogating her children.

In response, the judge scheduled the matter for another hearing on December 7, 2018 to allow Thelma time to make sure she did not want to care for David. He directed that Thelma appear at the hearing to advise the judge of her decision.

At the ensuing hearing, Thelma stated she felt overwhelmed by the Division and would not accept David into her care. Thelma again expressed that she was overwhelmed by Division caseworkers who called her at work in October 2018 to discuss David's need to attend therapy two to three times a week. The judge concluded Thelma did not want to take care of the child.

Eric's counsel then made an application to the judge to return the case to an FN docket, stating the Division "sabotaged" the placement. The judge denied the application and vacated the portion of the guardianship judgment placing David with Thelma. Accordingly, David remained with his resource family who still wish to adopt. This appeal followed.

On appeal, Terry and Eric contend that the Division failed to meet its burden of proof on all four prongs of the best interests of the child test. In his argument, Eric emphasized it was the Division's fault that Thelma changed her mind about caring for David and that it also failed to provide him with adequate services. We find no merit to these contentions.

On appeal from an order terminating parental rights, our review is limited. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). We defer to the "expertise [of] a Family Part judge," and are "bound by [his or her] factual findings so long as they are supported by sufficient credible evidence." N.J. Div. of Child Prot. & Permanency v. P.O., 456 N.J. Super. 399, 407 (App. Div. 2018) (first citing Cesare v. Cesare, 154 N.J. 394, 412 (1998); and then citing N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)). We "accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because

it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012). Overturning a family judge's factual findings is appropriate only when the findings "went so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). However, we do not afford "special deference" to the family court's interpretation of the law. D.W. v. R.W., 212 N.J. 232, 245 (2012).

Applying that standard here, we conclude Judge DeLorenzo made detailed factual findings that were supported by substantial, credible evidence rebutting each of defendants' arguments, and that his legal conclusions were unassailable. We affirm substantially for the reasons expressed by the judge. We only add the following comments.

Under the best interests test, N.J.S.A. 30:4C-15.1(a), the first two prongs require clear and convincing proof of harm and a parent's inability or unwillingness to eliminate the cause of the harm. The test does not require a child to have actually suffered irreparable harm, F.M., 211 N.J. at 449, nor is the harm limited to physical harm. In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977). It includes emotional and psychological harm as well. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 605 (1986).

Harm can be established by proof of a parent's failure to provide day-to-day nurturing and a safe and caring environment for a prolonged period of time. Id. at 604-07. It can exist even where the parent is "morally blameless." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001) (citing R., 155 N.J. Super. at 194-95); see also A.W., 103 N.J. at 616 ("Parents are not to be adjudged unfit because they lack resources or intelligence, but only by reason of conduct detrimental to the physical or mental health of the child, specifically in the form of actual or imminent harm.").

Although harm cannot be established by either a parent's incarceration or mental illness alone, see R.G., 217 N.J. at 556 (addressing incarceration), A.G., 344 N.J. Super. at 436 (addressing mental illness), either can be the basis for a finding of harm when it prevents a parent from providing for a child's care and safety because "the attention and concern of a caring family is 'the most precious of all resources.'" In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999) (quoting A.W., 103 N.J. at 613); see also F.M., 211 N.J. at 450-51; N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 481-83 (App. Div. 2012); N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 585 (App. Div. 2010) (quoting N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 94 (App. Div. 2008)).

Harm can be found in a situation where, for example, a parent occasionally visits their child but does not provide any "paternal care, nurture or support" and demonstrates a "persistent failure to perform any parenting functions" for an extended period. D.M.H., 161 N.J. at 380. That harm, however, can be overcome if the parent is diligent in attending to the child's needs even if the parent has been absent for some period of time. See N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 150-51 (2010) (reversing termination of a father's parental rights where, although he initially did not want custody of his child from an extramarital affair, sought to provide alternate custodial arrangements and eventually took custody of his child after demonstrating an ability to provide care and support).

Under our laws, a child should not be deprived of the safety and permanency he or she needs while waiting for his or her parent to overcome their obstacles arising from their mental illness or their incarceration. For that reason, the law "has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." L.J.D., 428 N.J. Super. at 484. "Keeping the child in limbo, hoping for some long term unification plan, would be a misapplication of the law." Ibid. (quoting A.G., 344 N.J. Super. at 438). A child's need for permanency and the

22

A-0035-18T3

legal policy to provide it expeditiously can only yield to a parent who is making diligent efforts to be reunited with a child, but who needs a reasonable period of time to complete those efforts. See F.M., 211 N.J. at 449-51.

Here, the evidence established that neither parent made or could make diligent reasonable efforts towards reunification, despite the Division's assistance and services. Eric had no relationship with David, having been incarcerated since before the child's birth. Eric recognized he was not available to parent his son, and although Eric successfully advanced Thelma as an appropriate caregiver and resource mother for David, Eric failed to demonstrate any interest in parenting David himself to the point that he refused to even attend court hearings where he could have spent time with his child. Suffice it to say, notwithstanding Eric's positive visits and completion of courses, there were no efforts, let alone diligent efforts, by Eric to preserve his relationship as a father to his son, nor any evidence he could provide a safe and stable permanent home for David in the foreseeable future. Similarly, and without any blame, Terry suffered from a combination of psychiatric and substance abuse issues that made it impossible for her to care for herself let alone her child in a safe and stable environment. In both parents' case, it was not their status that supported Judge DeLorenzo's decision. Rather, it was the effects of their situations on their

ability to provide safety, care, and sustenance for their child that compelled the result in this case.

Finally, while we understand that there was a dispute about why Thelma withdrew her request to care for and adopt David, there was no evidence to support the allegation that the Division somehow forced her into that decision. If anything, the evidence supported a finding that she, in fact, became overwhelmed with maintaining her full-time employment, having to address David's medical needs, and having to provide for his care. Even if she was not overwhelmed, there was no evidence suggesting she was willing to change her mind again and take custody of David. Without that evidence, and in light of the undisputed fact that David was doing well with his resource family, the judge correctly amended the judgment to allow David to remain in their home with an eye towards adoption and the permanency it would provide for him.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0035-18T3